**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
(JACKSONVILLE DIVISION)**

Wendell Perez, individually and as ）
next friend of A.P., a minor, ）
Maria Perez, individually and as next ）
friend of A.P, a minor, ）
                    Plaintiffs, ）    Case No:  3:22-cv-0083-TJC-JBT
v. ）
David Broskie, individually, and in ）
his official capacity as Superintendent ）
of Clay County District Schools, ）
John O'Brian, individually, and in his ）
official capacity as Principal of ）
Paterson Elementary School, ）
Courtney Schumacher, individually, ）
and in her official capacity as ）
Assistant Principal of Paterson ）
Elementary School, Destiney ）
Washington, individually and in her ）
official capacity as counselor at ）
Paterson Elementary School, Clay ）
County School Board ）
                   Defendants. ）

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS MOTION TO DISMISS FIRST AMENDED COMPLAINT**

    COME NOW, Plaintiffs, by and through their attorneys of record and file their

Memorandum of Law In Opposition to Defendants' Motion to Dismiss the First

Amended Complaint.

**FACTUAL SUMMARY**

    Defendants actively concealed from Wendell and Maria Perez that their 12-

year-old daughter, A.P., was being socially transitioned by defendants to a boy

named "M" and was subject to intense bullying. (First Amended Complaint, "FAC," ¶¶ 1, 25, 31-34, 40-42, 54-58, 63-65, 69-70). It was not until after A.P. attempted suicide at school twice that the Perezes learned that Defendants had been secretly engaging in mental health treatment in the form of social transitioning[1] to a discordant gender identity with their daughter who had never expressed any concerns or exhibited any signs of distress about her gender identity at home. (FAC, ¶¶ 30-34, 40-43, 58, 65, 68-70).

At a January 5, 2022 meeting when Mr. and Mrs. Perez were first informed of defendants' secret social transitioning of A.P., Defendant Washington informed the Perezes that they were deliberately not informed about the social transitioning of A.P. because of the family's Catholic faith. (FAC, ¶25). Plaintiffs later learned that weeks earlier Mrs. Washington asked A.P. whether her parents "accepted" A.P.'s desire to identify as a boy named "M," and A.P. said her parents did not know and she did not want them to know because of their Christian beliefs. (FAC ¶59). Mrs. Washington assured the 12-year-old that her parents would not be told. (FAC, ¶60). This assurance was contrary to Florida's Parents Bill of Rights and the District's published statement that children do not have confidentiality rights as to their parents. (FAC ¶¶37, 60, Exhibit A). Contrary to the confidentiality statement and

---

[1] As this Court acknowledged in *Adams v. School Bd. of St. Johns County*, 318 F. Supp. 3d 1293, 1299-1300 (M.D. Fla. 2018), "social transitioning" in the form of *inter alia*, name and pronoun changes, are part of the mental health treatment for gender dysphoria.

Florida law, Defendant Schumacher told the Perezes on January 5 that they could not be told about the social transitioning of A.P because "confidentiality issues" prevented District personnel from notifying them. (FAC, ¶35).

The Perezes later learned that Mrs. Washington initiated meetings with A.P. without their knowledge and consent and continued to meet at least weekly with A.P. during which time Mrs. Washington promoted and facilitated the social transitioning of A.P. to an identity as a "boy" named "M." (FAC, ¶¶54-57, 61, 64). While adhering to and protecting A.P.'s so called "confidentiality" vis-a-vis her parents, Mrs. Washington neither honored nor protected A.P.'s "confidentiality" with regard to peers with whom A.P. had not shared the information. (FAC ¶¶60-61). That led to bullying by classmates which A.P. shared with Mrs. Washington but was not addressed. (FAC ¶¶58, 61-62). A.P. became more confused and depressed as bullying she had been led to believe would be diminished by social transitioning in fact increased. (FAC ¶63). Still, her parents were kept in the dark regarding the social transitioning and bullying until Mrs. Washington called them after the second failed suicide attempt. (FAC ¶¶42, 65).

Florida's Parents Bill of Rights (the "Parents BOR") became law on July 1, 2021 before Defendants' interactions with the Perez family. (FAC ¶71). The Parents BOR memorializes the fundamental parental rights in the U.S. and Florida constitutions, including the rights to direct their children's education, upbringing,

moral or religious training and to make health care decisions for their minor children without obstruction or interference from the government. (FAC ¶72). The Parents BOR prohibits withholding information related to children's well-being and requires that school districts provide consistent mechanisms for notifying parents of their rights. (FAC ¶¶73-75). Defendants did not establish consistent mechanisms for notifying parents of their rights and/or failed to properly train and supervise District staff regarding those rights as demonstrated by the actions by Defendants Schumacher and Washington on and before January 5, 2022. (FAC ¶¶77-80).

Defendants also failed to enact policies or procedures and/or to properly train and supervise District staff regarding Fl. Stat. §1008.386(3),[2] which requires that, beginning in sixth grade, student identification cards must contain crisis and suicide prevention information. (FAC ¶82). A.P.'s 6th grade identification did not include the required information she could have utilized to seek help instead of attempting suicide when the social transitioning promoted by Defendants and concealed from her parents led to bullying. (FAC ¶¶82-84).

## LEGAL ARGUMENT

### I.   Plaintiffs' Complaint Is Not A "Shotgun" Pleading.

Plaintiffs' factually detailed multi-count Complaint against multiple Defendants is not *ipso facto,* a "shotgun" pleading. A complaint is subject to

---

[2] The FAC contained a typographical error, referencing Section 1008.386 as 1008.383.

4

dismissal as a "shotgun" pleading only where "it is virtually impossible to know which allegations of fact are intended to support which claim(s) for relief." *Weiland v. Palm Beach*, 792 F.3d 1313, 1325-26 (11th Cir. 2015). As was true in *Weiland*, "no such virtual impossibility exists in this case," as demonstrated by Defendants' lengthy Motion to Dismiss reciting why certain facts alleged against certain defendants are purportedly inadequate. *See id.*

Unlike the "quintessential shotgun pleadings" referenced in the *dicta* footnote in *Keith v. DeKalb County*, 749 F.3d 1034, 1046 n.9 (11th Cir. 2014), the FAC does not incorporate all previous allegations into each succeeding cause of action, but merely incorporates the factual allegations that are the basis for all claims against Defendants. In addition, the FAC specifies in each cause of action which Plaintiffs are alleging the claim against which Defendants. (FAC, pp. 24, 28, 33, 39, 42, 46, 49, 54, 57, 59). Also, within each cause of action there are Defendant-specific allegations of acts and/or omissions which each party did or failed to do vis-a-vis Plaintiffs. (FAC, ¶¶ 90-93, 104-107, 121-124). The FAC adequately puts Defendants on notice of the specific claims against them and the factual allegations supporting those claims. Therefore, it is not a "shotgun pleading." *Weiland*, 792 F.3d at 1325.

## II.    The Official Capacity Claims Are Not Duplicative.

The Eleventh Circuit's statement that a "§1983 suit against an official of the government in his official capacity is deemed to be a suit against the entity that

employs the official," *Busby v. City of Orlando* 931 F.2d 764, 776 (11th Cir. 1991), does not require dismissal of the individual Defendants in their official capacities. Mr. Broskie is a constitutional officer elected pursuant to Article IX, §5 of the Florida Constitution, not an agent or employee of the School Board. (FAC, ¶10). Therefore, a suit against Mr. Broskie is not duplicative of a suit against the School Board. Defendants are trying to change this reality by claiming that Plaintiffs sued "the Office of the Superintendent," whatever that is. (MTD, p. 6). Defendants' linguistic legerdemain notwithstanding, "[t]he school superintendent [is] not a mere agent or employee of the school board improperly joined as a defendant. He was properly sued as an agency separate from the school board." *School Bd. of Orange County v. Coffey*, 524 So. 2d 1052, 1054 (Fla. Dist. Ct. App. 1988).

Even as to the individual defendants who are employed by the School Board, *Busby* does not require dismissal, particularly at this stage in the litigation. *Hatcher v. Desoto County Sch. Dist. Bd. of Educ.* 939 F. Supp. 2d 1232, 1236 (M.D. Fla. 2013). "It is true that an official capacity claim may be redundant when the entity is also a named defendant." *Id.* However, in *Hatcher*, as here, the School Board was contesting any liability based on the individual defendants' conduct. "[T]herefore it remains plausible at this stage of the proceedings that a separate official capacity claim can be maintained" against the board's employees. *Id.*

**III.   Individual Defendants Are Not Entitled To Qualified Immunity And The School Board Is Liable For Failure To Train.**

Defendants claim that the individual Defendants are entitled to qualified immunity and the School Board has no liability under the principles of *Monell v. Dept. of Social Serv. of City of New York,* 436 U.S. 658 (1978). (MTD, pp. 14-17). Neither proposition has merit.

### A. Defendants do not show they were engaged in discretionary functions to support qualified immunity.

Defendants cannot receive the benefit of qualified immunity unless they first show, not just assert, that they were engaged in a "discretionary function" when they performed the acts of which the Plaintiffs complain. *Holloman v. Harland*, 370 F.3d 1252, 1263-64 (11th Cir. 2004). "While a number of our cases omit this step of the analysis, binding Supreme Court and Eleventh Circuit precedents require us to consider expressly this critical threshold matter." *Id.* at 1264.  It is a two-fold inquiry: "whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." *Id.* at 1266.

To meet their initial burden of proof, Defendants must show "objective circumstances which would compel the conclusion that [their] actions were undertaken pursuant to the performance of [their] duties and within the scope of [their] authority." *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991).

7

Defendants do not make the necessary showing here. Instead, Defendants merely state that it is "indisputable" that they were acting within their discretionary authority. (MTD, p.16). Defendants claims it is "indisputable" because they would have the Court believe that secretly socially transitioning a 12-year-old girl is nothing more than garden variety school guidance counseling. Defendants derisively claim that "Plaintiffs knew or should have known through the exercise of due diligence that no mental health counseling, therapy, or treatment was provided, and the use of the word 'counseling' in that context is either knowingly untrue, or reckless." (MTD p.11 n.3). In fact, as this Court and other courts have acknowledged, social transitioning of a child through, *inter alia*, use of an alternate name and pronouns, is part of the mental health treatment protocol for gender dysphoria. *Adams*, 318 F. Supp. 3d at 1299-1300; *Grimm v. Gloucester County Sch. Bd.*, 972 F.3d 586, 596 (4th Cir. 2020). Therefore, Defendants **were in fact** providing "mental health counseling, therapy, or treatment" to A.P. Defendants, who are employed to educate children, do not state that any of them are licensed mental health professionals qualified to engage in social transitioning. Furthermore, even if they were so qualified, they do not allege that A.P. is an emancipated minor or otherwise entitled to circumvent the requirement for parental consent prior to receiving such treatment under Fla. Stat. Chap. 743. Therefore, there are no "objective circumstances which would compel the conclusion that [their] actions

8

were undertaken pursuant to the performance of their duties and within the scope of [their] authority." *Courson*, 939 F.2d at 1487. Defendants cannot meet the initial threshold for qualified immunity.

### B. Defendants Violated Clearly Established Rights

Even if Defendants were able to meet their burden, they still would not be entitled to qualified immunity because by engaging in mental health treatment with a 12-year-old child without parental consent Defendants have violated clearly established rights. Qualified immunity only offers "complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Maddox v. Stephens*, 727 F.3d 1109, 1120 (11th Cir. 2013). If objective observers cannot predict—at the time the official acts—whether the act was lawful or not, and the answer must await full adjudication in a district court years in the future, the official deserves immunity from liability for civil damages. *Id.* That is not the case here. Objective observers can predict that: 1) engaging in mental health counseling with a 12-year-old girl without the consent of her parents, 2) intentionally withholding information related to a 12-year-old's mental health because the family's religious views would not support the child's desires and 3) failing to enact a policy to notify parents of mental health issues

9

regarding their child as required under the Parents BOR is unlawful without awaiting adjudication.

### 1. The FAC Alleges Violations of Parental Rights Under §1983.

Defendants allege that "there is no protected constitutional right" for parents to receive notification that school officials are facilitating social transition of their 12-year-old daughter or for Defendants to obtain consent from parents to engage in such discussions with their child. (MTD, p. 8). Since social transitioning, *i.e.*, affirming a child's discordant gender identity, involves significant mental health and medical decisions affecting the well-being of children with potentially life-long consequences (FAC ¶69, 223), it is impossible to fathom how Defendants can, in good faith, claim that parents have no protected constitutional right to be aware of and consent to such actions.

For nearly 100 years, the Supreme Court has established that the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children as part of directing the education and upbringing of their children. *Pierce v. Society of Sisters*, 268 U.S. 510 (1925); *Troxel v. Granville*, 530 U.S. 57, 68 (2000). The Constitution also protects the private realm of the family from interference by the state. *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944).

10

Most importantly for this case, parents' fundamental due process rights include directing the medical and mental health decision-making for their children. *Parham v. J. R.*, 442 U.S. 584, 604 (1979). *Parham* affirmed that parents (not public schools) "retain a substantial, if not the dominant, role in medical and mental health care decisions for their children, absent a finding of neglect or abuse." *Id.* If the parent is fit and there are no allegations of neglect or abuse, then courts should apply the traditional presumption that parents act in the best interests of their children. *Id.* Notably, the *Parham* Court affirmed that parental decision-making predominates even when the parents' choice is disagreeable to the child (such as not using a "preferred" name or pronoun). *Id.* at 603.

The Eleventh Circuit relied on *Parham'*s holding that "[t]he law's concept of the family presumes that parents possess what a child lacks in maturity, experience and capacity for judgment," as authority for its finding that school officials' withholding information from parents stated a claim for interference with their fundamental rights. *Arnold v. Bd. of Educ. of Escambia Cty.*, 880 F.2d 305, 314 (11th Cir.1989) (citing *Parham,* 442 U.S. at 602). Also referencing *Pierce,* the Eleventh Circuit determined that a directive to not disclose information to parents "unduly interferes with parental authority in the household and with the parental responsibility to direct the rearing of their child." *Id.* at 313-14. "This deprives the parents of the opportunity to counter influences on the child the parents find inimical

11

to their religious beliefs or the values they wish instilled in their children." *Id.* at 313. Therefore, schools must refrain from such directives. *Id.*

The Eleventh Circuit's analysis under *Arnold,* not the dissimilar student discipline and personal injury cases cited by Defendants (MTD, pp. 12-13), should instruct this Court's analysis of the substantially similar claims raised by Plaintiffs. The cases cited by Defendants[3] addressed claims for violations of the students' substantive due process rights due to tortious conduct of school staff. In *Arnold,* the court addressed claims for violations of the parents' substantive due process rights resulting from school staff intentionally concealing critical medical and mental health information from parents. *Id.* at 313. That is the crux of the claims here.

### 2. Fundamental Parental Rights Are Clearly Established.

The relevant, dispositive inquiry in determining whether a right is clearly established is "whether it would be clear to a reasonable [state official] that [her] conduct was unlawful in the situation [she] confronted." *Maddox,* 727 F.3d at 1121. In the context of this case, a confluence of long-standing Supreme Court and Eleventh Circuit opinions and the Parents' BOR incorporation of the principles in those opinions leave no doubt that it is unlawful to conceal from parents that their child is being socially transitioned and fail to put notification policies in place.

---

[3] *Davis v. Carter*, 555 F.3d 979 (11th Cir.2009), *Nix v. Franklin Cnty. Sch. Dist.*, 311 F.3d 1373 (11th Cir. 2002), *K.W. v. Lee Cnty. Sch. Bd.*, 67 F. Supp. 3d 1330 (M.D. Fla. 2014), *Dacosta v. Nwachukwa*, 304 F.3d 1045 (11th Cir. 2002), *Kirkland v. Greene Cnty. Bd. of Educ.*, 347 F.3d 903 (11th Cir. 2003), *Neal ex rel. Neal v. Fulton Cnty. Bd. of Educ.,* 229 F.3d 1069 (11th Cir. 2000).

At the time that Defendants interacted with Plaintiffs' daughter in 2021, it had been clearly established in the Eleventh Circuit for more than 30 years that school officials violate parents' fundamental rights to direct their children's upbringing when they direct that parents not be informed about medical and mental health issues regarding their children. *Arnold*, 880 F.2d at 313-14. That clearly established right was in turn based on constitutional rights that had been clearly established by the Supreme Court for nearly 100 years in the case of *Pierce* and more than 40 years in the case of *Parham.*

Furthermore, as of July 1, 2021, Florida law specifically incorporates the constitutional rights described in *Pierce, Troxell, Parham* and *Arnold* and defines them as fundamental. Fla. Stat. §§ 1014.03, 1014.04. The Parents' BOR statute makes clear that governmental entities "may not infringe on the fundamental rights of a parent to direct the upbringing, education, health care, and mental health of his or her minor child" without satisfying strict scrutiny. Section 1014.03. Fla. Stat. §1014.02 makes it abundantly clear to school boards, administrators, and staff that "important information relating to a minor child should not be withheld, either inadvertently or purposefully, from his or her parent, including information relating to the minor child's health, well-being, and education, while the minor child is in the custody of the school district." Fla. Stat. §1014.02 further states that "it is necessary

13

to establish a consistent mechanism for parents to be notified of information relating to the health and well-being of their minor children."

Every objectively reasonable official standing in Defendants' place viewing longstanding federal court precedent incorporated into state law would be on notice that what they were doing, *i.e.* concealing information regarding social transitioning from a child's parents, "would be clearly unlawful given the circumstances," thereby vitiating qualified immunity. *Pace v. Capobianco*, 283 F.3d 1275, 1282 (11th Cir. 2002). In light of the law's admonition that consistent parental notification mechanisms be put in place, Defendants School Board and Broskie were on notice that failing to enact such mechanisms and/or train staff on parental notice was clearly unlawful. "[I]n the light of pre-existing law... only a plainly incompetent [employee] or one who was knowingly violating the law would have done such a thing." *Id.*

### C. The FAC Sufficiently Alleges School Board Liability

When, as Plaintiffs allege here, a municipality's (in this case, the School Board's) failure to train evidences deliberate indifference to the rights of its stakeholders (parents), that shortcoming can be properly thought of as a "policy or custom" actionable under §1983 under the principles of *Monell v. City of Canton, Ohio v. Harris*, 489 U.S. 378, 388-89 (1989). When policymakers are on actual or constructive notice that a particular omission in their training program causes employees to violate citizens' constitutional rights, they may be deemed deliberately

14

indifferent if they fail to remedy the problem. *Connick v. Thompson*, 563 U.S. 51, 61-62 (2011).

Here, as described immediately above, the Parents' BOR gave the School Board actual notice that withholding information related to the minor child's health, well-being, and education from parents while the minor child is in the custody of the school district violates parents' fundamental rights. Fla. Stat. §§ 1014.02-1014.04. The School Board was also on actual notice that failing to provide a consistent mechanism for notifying parents of their rights would violate those rights. *Id.* Nevertheless, as alleged in the FAC, the School Board failed to provide the mechanism for notifying parents or to enact a policy to prevent the withholding of information, establishing deliberate indifference to parents' constitutional rights. (FAC ¶¶77, 78). In addition, the School Board failed to adequately train District employees regarding parental rights and the prohibition against withholding information from parents regarding their child's mental health, resulting in violations of Plaintiffs' constitutional rights. (FAC ¶¶79, 80). The School Board's failure to train is evidenced by Mrs. Schumacher's statement that "confidentiality issues" prohibited District staff from informing the Perezes about the social transitioning of A.P., demonstrating that staff had not been instructed that parental notification was legally required. (FAC ¶ 35).

15

Finally, the FAC alleges that the School Board failed to train its employees on the requirements of Fl. Stat. §1008.386(3) which deprived A.P. of access to suicide prevention resources when she became suicidal. (FAC ¶¶ 83, 84). These allegations sufficiently state a failure to train and other omissions for which liability can attach to the School Board under *Monell.*

## IV.    The FAC Sufficiently Alleges Free Exercise Violations

### A. *Plaintiffs Sufficiently Plead Constitutional Violations.*

Plaintiffs allege violation of their right to free exercise of religion under the U.S. and Florida Constitutions, for which the analysis is identical (FAC ¶¶136-157); *Cambridge Christian Sch. v. Fla. High Sch. Athletic Ass'n* 942 F.3d 1215, 1246 (11th Cir. 2019). "To plead a claim for relief under the Free Exercise Clauses of the U.S. and Florida Constitutions, a plaintiff 'must allege that the government has impermissibly burdened one of [its] 'sincerely held religious beliefs.'" *Id.* (citation omitted). The pleading requirement has two components: "(1) the plaintiff holds a belief, not a preference, that is sincerely held and religious in nature, not merely secular; and (2) the law at issue in some way impacts the plaintiff's ability to either hold that belief or act pursuant to that belief." *Id.* (citing *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1256-57 (11th Cir. 2012)). As was true in *Cambridge Christian School,* Plaintiffs here have satisfied both components.

16

Plaintiffs have alleged that they are practicing Roman Catholics whose sincerely held religious beliefs include: 1) human beings are created male or female and that the natural created order regarding human sexuality cannot be changed; 2) parents have the non-delegable duty to direct the upbringing and beliefs, religious training, and medical and mental health care of their children; 3) all people are to be treated with respect and compassion, including refraining from misrepresenting an individual's natural biological and created identity as either a male or a female, and 4) that individuals are to speak the truth. (FAC, ¶¶138-141, 153-156). Unlike the allegations found deficient in *GeorgiaCarry*, 687 F.3d at 1258, Plaintiffs allege more than mere preferences, but beliefs grounded in Scripture and church teachings that "permeate all aspects of their lives." (FAC, ¶¶17, 18) Defendants' statements that they concealed information because of Plaintiffs' beliefs attest to the sincerity of the beliefs. (FAC, ¶¶25, 60).

As was true in *Cambridge Christian School,* 942 F.3d at 1249, Plaintiffs here have sufficiently alleged that the Defendants' acts and omissions have affected their ability to act pursuant to their beliefs. Defendants' concealment of their social transitioning of A.P. prohibited the Perezes from being informed of her mental health issues and seeking guidance for A.P. in a manner that is consistent with the beliefs held by the Perez family. (FAC, ¶¶ 142-146,158-160). Mr. and Mrs. Perez were prevented from exercising their religious beliefs by providing faith-informed

17

guidance to A.P. before Defendants had introduced to A.P. questions about the veracity of their beliefs, impacting their ability to effectively guide A.P. under the tenets of their faith at a pivotal time in A.P.'s life.

### B. Plaintiffs Sufficiently Plead Violation of Florida's RFRA

The allegations of the FAC also satisfy the narrower definition of "substantial burden" that the Florida Supreme Court has adopted under Florida's RFRA, Fla. Stat. § 761.03. *Warner v. City of Boca Raton*, 887 So. 2d 1023, 1033 (Fla. 2004). Under RFRA, "a substantial burden on the free exercise of religion is one that either compels the religious adherent to engage in conduct that his religion forbids or forbids him to engage in conduct that his religion requires." *Id.*

Because of Defendants' acts and omissions, the Perezes were prohibited from engaging in faith-based guidance at the onset of A.P.'s mental health issues when her gender identity questions could be effectively answered in the context of their religious faith. (FAC ¶¶ 212-213). Defendants' actions compelled A.P. to choose between her religious beliefs and the idea that she could a identify as a boy named "M." a conflict so significant that it led to her attempting suicide twice while under the supervision of School District personnel. (FAC, ¶214).

18

**V.    The FAC Sufficiently Alleges State Law Claims.**
   *A. Florida Stat. Ch. 1014 Includes An Implied Private Right Of Action.*

When analyzed in the context of United States and Florida Supreme Court precedent, the Parents' BOR, Florida Statutes Chapter 1014, includes an implied private right of action when analyzed under the four-part test in *Cort v. Ash*, 422 U.S. 66, 80-84 (1975) and useful purpose test under *Smith v. Piezo Tech. & Prof'l Adm'rs*, 427 So. 2d 182, 184 (Fla. 1983).

Under *Cort*, the question of whether a private remedy should be implied is determined by answering: 1) whether the statute was enacted for the benefit of a special class of which plaintiff is a member, 2) whether there is any indication of legislative intent to create a private remedy, 3) whether implication of such a remedy is consistent with the underlying purposes of the legislative scheme, and 4) whether a federal remedy is inappropriate because the subject matter is a state concern, which is not applicable to this state statute. 422 U.S at 80-84. Here, the statute was enacted for the benefit of parents, the incorporation of the strict scrutiny standard into Section 1014.03 evinces an intent for judicial review, and a private right of action fulfills the purpose of ceasing state interference with the protection of parents' rights.

Under *Smith,* "A private right of action may be implied from a statutory provision that would serve no useful purpose in the absence of a private right of action." 427 So. 2d at 184. Here the Parents' BOR's extensive recitation of parents'

rights vis-a-vis their children will be meaningless if parents cannot take legal action against educators when those rights are violated. Disciplinary action against school employees does not provide any remedy for parents whose rights have been violated or to compel the cessation of systemic parental rights violations.

### B. The FAC States Viable Claims Under the Florida Constitution

Parents' right to direct their children's upbringing is not merely "protected," but recognized as fundamental in Article 1, §23 of the Florida Constitution. *Von Eiff v. Azicri*, 720 So.2d 510, 514 (Fla.1998). "[I]t appears to be an unassailable proposition that otherwise fit parents...who have neither abused, neglected, or abandoned their child, have a reasonable expectation that the state will not interfere" with their decision-making. *Id.* at 515. Plaintiffs here had the reasonable expectation that Defendants would not interfere with their decision-making related to A.P.'s mental health issues or religious training/beliefs. Defendants' intentional concealment of information required to engage in that decision-making states a claim for violation of Plaintiffs' fundamental parental rights under the Florida Constitution.

Article 1, §9 of the Florida Constitution protects the "full panoply of individual rights" of the U.S. Constitution, and in particular, the long-established fundamental right of parents to direct the upbringing of their children, from unwarranted encroachment by the government. *J.B. v. Fla. Dep't of Child. & Fam.*

20

*Servs*., 768 So. 2d 1060, 1063 (Fla. 2000). As discussed more fully *supra,* Plaintiffs have alleged facts that state claims for violation of their fundamental parental rights under the U.S. Constitution and, therefore, the Florida Constitution.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss should be denied.

Dated: April 4, 2022.

/s/Mary E. McAlister

Mary E. McAlister (FL Bar No. 0010168)
CHILD & PARENTAL RIGHTS CAMPAIGN, INC.
P.O. Box 637
Monroe, VA 24574
770.448.4525
mmcalister@childparentrights.org

Vernadette R. Broyles (GA Bar No. 593026)*
CHILD & PARENTAL RIGHTS CAMPAIGN, INC.
5805 State Bridge Rd., Suite G310
Johns Creek, GA 30097
770.448.4525
vbroyles@childparentrights.org

Ernest G. Trakas (MO Bar 33813)*
Evans & Dixon, LLC
211 N. Broadway
St. Louis, MO 63102
 (314) 552-4188
etrakas@evans-dixon.com
* admitted pro hac vice
Attorneys for Plaintiffs

21

## CERTIFICATE OF SERVICE

I certify that on this 4th day of April 2022, a true and correct copy of the foregoing was electronically filed in the U.S. District Court, Middle District of Florida, using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

/s/ *Mary E. McAlister*
MARY E. MCALISTER