## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## (JACKSONVILLE DIVISION)

| | | |
|---|---|---|
| Wendell Perez, individually and | ) | |
| as next friend of A.P., a minor | ) | |
| Maria Perez, individually and | ) | |
| as next friend of A.P, a minor, | ) | |
| | ) | |
| Plaintiffs | ) | Case No. 3:22-cv-0083-TJC-JBT |
| v. | ) | |
| Clay County School Board, | ) | |
| David Broskie, Superintendent of | ) | |
| Clay County District Schools, in his | ) | |
| Official and individual capacities, | ) | |
| Destiney Washington, counselor | ) | |
| at Paterson Elementary School, in her | ) | |
| individual capacity, | ) | |
| | ) | |
| Defendants. | ) | |

## SECOND AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND DAMAGES

Plaintiffs, Wendell Perez, individually and as next friend of A.P., a minor, and Maria Perez, individually and as next friend of A.P, a minor ("Plaintiffs"), by and through counsel, file this civil action and respectfully request this Court to issue a declaratory judgment and award damages for violations of the United States Constitution and Florida Statutes by Defendants, Clay County School Board, David Broskie, and Destiney Washington.

In support thereof, Plaintiffs state:

1

## INTRODUCTION

1.      Plaintiffs Wendell and Maria Perez, acting on behalf of themselves and their daughter, A.P., bring this action to vindicate their fundamental rights as enumerated in the United States Constitution and rights protected under Florida Statutes.

2.      Through implementation of a protocol and practice of concealing information from parents related to their children's gender identity, Defendants exceeded the bounds of legitimate pedagogical concerns and violated Mr. and Mrs. Perez's fundamental right to direct the upbringing of and make medical and mental health decisions for A.P.  Defendants' actions also violated Mr. and Mrs. Perez's and A.P.'s fundamental right to preserve familial privacy.

3.      Defendants' protocol and practice of concealing information from parents and conduct in promoting a false male identity in A.P. have also violated the Mr. and Mrs. Perez's, as well as A.P.'s, fundamental First Amendment rights to free exercise of religion.

## JURISDICTION AND VENUE

4.      This action is filed pursuant to 42 U.S.C. § 1983 seeking redress of injuries suffered by Plaintiffs from deprivation, under color of state law, of rights secured by the First and Fourteenth amendments to the United States Constitution,

laws of the United States, and the laws of Florida. Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 and 1343(a).

5.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and other applicable law because the events and omissions giving rise to the claims in this action arose in Clay County, Florida, which is situated within the district and divisional boundaries of the Middle District of Florida.  Venue is also proper in this Court because the Defendants reside or have their principal place of business in this District.

6.    This Court is authorized to grant declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, implemented through Federal Rule of Civil Procedure 57.

7.    An actual controversy exists between the parties involving substantial constitutional issues, in that Plaintiffs allege that Defendants' policies, procedures, protocols or directives and actions taken in accordance with them, as applied, violate the United States Constitution and have infringed Plaintiffs' rights, while Defendants allege that their policies, procedures, protocols or directives and associated actions do not violate the United States Constitution.

8.    This Court is authorized to grant Plaintiffs' prayer for relief regarding costs, including a reasonable attorney's fee, under 42 U.S.C. § 1988.

## PARTIES

9.      Plaintiffs Wendell and Maria Perez, and their daughter, A.P., are residents of Clay County, Florida.

10.      Plaintiffs' daughter, A.P. was a student at Paterson Elementary School, which is part of Clay County District Schools, at all times relevant to the Complaint.

11.      Mr. and Mrs. Perez and their daughter, A.P., are practicing Roman Catholics who live their lives in accordance with sincerely held religious beliefs. Their sincerely held beliefs are based on Scripture, Church teachings, natural law and objective truth, including that human beings are created male and female, which cannot be changed, and that children are to respect their parents and other adult authority figures.

12.      Defendant Clay County School Board is the governing body for public schools in Clay County, Florida, with the authority to sue and be sued, and was at all times material acting under color of law.

13.      Defendant David Broskie ("Mr. Broskie") is the Superintendent of Clay County District Schools ("District"), having been elected by the citizens of Clay County pursuant to Article IX, § 5 of the Florida Constitution.

14.      As Superintendent, Mr. Broskie is the executive officer of the School Board, tasked with implementing and enforcing School District policies set out by the School Board, as well as supervising and disciplining employees under Fla. Stat.

4

§ 1001.33. He nominates candidates for District positions to the School Board which then votes on whether to hire the individuals. He is sued in his individual and official capacities.

15.     Defendant Destiney Washington ("Mrs. Washington") is a School Counselor at Paterson Elementary School, which is part of Clay County District Schools. She is sued in her individual capacity.

## STATEMENT OF FACTS

### *A.P.'s Experiences at Paterson Elementary*

16.     Mr. and Mrs. Perez's and A.P.'s sincerely held religious beliefs were known to District staff when A.P. was enrolled in Clay County District Schools.

17.     During the 2021-2022 school year A.P. was 12 years old and a sixth grader at Paterson Elementary School.

18.     Beginning early in the fall of 2021, at the beginning of the 2021-2022 academic year A.P. was being bullied by her peers for being too "boyish," *e.g.,* liking the outdoors, playing video games, and interacting with male peers.

19.     A.P.'s peers did not like her behavior, believed that she was seeking attention, and taunted and harassed her throughout the school day and on the bus. A.P. reported the bullying to District staff, including the bus driver, but it continued unabated.

20.     A.P. began feeling conflicted about her sex. She knew she was a girl, but wanted to be like a boy, believing she would not be bullied if she were perceived as "strong" like a boy.

21.     A.P. had heard the word "transgender" from a friend and read about it on the internet. She wondered if she could be transgender so that she could be seen as a boy and not get bullied.

22.     A.P. was also having difficulty with her classes. She asked a teacher for help but did not receive any.

23.     In October 2021, A.P. was still being bullied even after notifying school staff. She was distressed by the bullying and was looking through internet postings about self-harm. School staff found out about the searches and A.P. was interviewed by school counselor Mandy Sad.

24.     Mrs. Sad contacted Mr. Perez. Mr. Perez told Mrs. Sad that he and Mrs. Perez would address the issue with A.P. and seek private advice and counseling as they deemed appropriate.

25.     Nevertheless, shortly thereafter, A.P. was instructed to meet with Mrs. Washington. A.P. was told that she was going to meet weekly with Mrs. Washington but was not told why she was meeting with her.

26.    Mr. and Mrs. Perez were not notified about the weekly sessions with Ms. Washington put in place after they notified the District that they were exercising their rights as parents to make the decision regarding counseling for their daughter.

27.    A.P. was still feeling conflicted about her sex and how to make the bullying stop when she went to see Mrs. Washington.

28.    A.P. saw rainbow posters with the word "safe space" on the walls of Mrs. Washington's office and asked Mrs. Washington if she supported transgender people. Mrs. Washington replied, "All these rainbows aren't here for no reason."

29.    A.P. asked Mrs. Washington if she could "be a boy." Mrs. Washington did not ask what A.P. meant or inquire about her feelings.

30.    A.P. knew that she could not become a boy. However, in asking the question of Mrs. Washington, A.P. wondered if she could be seen as a boy or like a boy so that the bullying would stop.

31.    Mrs. Washington answered "yes" to A.P.'s question about becoming a boy and immediately asked A.P. for a boy name. A.P. gave Mrs. Washington the name "M."

32.    Beginning with that first meeting and continuing throughout the fall semester, Mrs. Washington consistently called A.P. "M." instead of "A." and treated her as if she were a boy when interacting with her. A.P. had not requested to be referred to by that name. A.P. did not correct Mrs. Washington because A.P. knew

7

that she was supposed to respect Mrs. Washington as an adult authority figure and correction would be viewed as being disrespectful.

33.     A.P. was still working through her feelings and had not told her parents. Mrs. Washington asked A.P. if her parents knew about the male name and boy identity. A.P. said they did not and said that the family was Roman Catholic.

34.     A.P. did not ask Mrs. Washington to not tell her parents, but Mrs. Washington promised that she would not tell them. This created a conflict for A.P. between respecting her parents and respecting Mrs. Washington as Mrs. Washington's promise would mean that they would be keeping secrets from her parents.

35.     As well as discussing transgender issues, Mrs. Washington shared intimate details regarding her life with A.P., such as about Ms. Washington becoming engaged and information about her fiancé, which made A.P. uncomfortable. Mrs. Washington did not inquire about or address the difficulties A.P. was having academically or the ongoing bullying problem that A.P. had shared with her.

36.     During one session, Mrs. Washington asked A.P. what she had done over the weekend. When A.P. responded that she had played video games and gone to church, Mrs. Washington told A.P. that the last time she (Mrs. Washington) went to church she was kicked out because her skirt was really, really short.

37.    A.P. was disturbed by the conversation. She was already feeling conflicted because Mrs. Washington, an adult authority figure, was treating her as a boy named "M." when A.P. knew she was a girl. The revelation regarding Mrs. Washington being kicked out of church for inappropriate dress exacerbated A.P.'s distress. A.P. did not know if she was supposed to visualize Mrs. Washington in a too-short skirt as a girl or as if she was a boy as Mrs. Washington communicated.

38.    A.P. was also disturbed because she believed Mrs. Washington was expressing disapproval of church teachings regarding modesty and thereby telling A.P. that it was acceptable to question church teachings and her parents' instruction in accordance with those teachings.

39.    A.P. did not tell anyone else at Paterson Elementary, students or staff, about the name "M" or about her conflict regarding her sex. A.P. did not tell anyone that she identified as or wanted to be treated as a boy.

40.    A.P. did not consent to Mrs. Washington telling anyone about the male name "M." and Mrs. Washington did not ask A.P. for permission to speak to others about it.

41.    A.P. mentioned to Mrs. Washington that a teacher had said in passing that she could not use anything but a child's legal name without contacting parents. Mrs. Washington told A.P. "not to worry," that she (Mrs. Washington) would see to

it that all of A.P.'s teachers call her "M" and he/him. She said, "I don't know when it will happen, but it will happen."

42.   A.P. was distressed by Mrs. Washington's promise because she did not want to be publicly addressed that way and had not asked or given permission for Mrs. Washington to share this information.

43.   One day while A.P. was walking toward the bus with her classmates she waved at Mrs. Washington and Mrs. Washington called back "Hi M." A.P.'s classmates heard the false male name and the bullying intensified once the classmates told others about the exchange.

44.   A.P. told Mrs. Washington that the bullying had intensified after Mrs. Washington used the name "M" in front of classmates without A.P.'s permission. Mrs. Washington said she was sorry but did not, to A.P.'s knowledge, report the bullying, take actions to see that it stopped, inform or involve A.P.'s parents.

45.   A.P. later repeated to Mrs. Washington that she was having increased bullying problems because of Mrs. Washington's unconsented use of the alternate male name in front of A.P.'s peers. Mrs. Washington merely said that things are hard sometimes.

46.   A.P. became increasingly distressed as she continued to meet with Mrs. Washington and be treated as a boy. She feared that Mrs. Washington might try to make further unauthorized disclosures to A.P.'s peers or teachers.

10

47.    A.P. felt coerced into continuing with the secret male identity with Mrs. Washington and the people whom Mrs. Washington told. Once Mrs. Washington impermissibly disclosed the male name to A.P.'s peers it was impossible for A.P. to stop others from using the male name. To attempt to do so would require publicly telling others that she did not want to be treated as a boy named "M," which would further exacerbate the peer harassment that District staff had already failed to address or inform her parents about.

48.    A.P. became increasingly distressed about being coerced into living a secret double life. A.P. felt that Mrs. Washington had total control over A.P.'s life at school and that A.P. had no recourse to enduring the distress caused by the secrecy and increasing bullying that Mrs. Washington refused to address.

49.    Mrs. Washington continued to promote A.P. as a boy named "M." without her permission and without notifying Mr. and Mrs. Perez. This included signing A.P. up as a boy for a "shop with a cop" event and telling her she could shop with the boys while using the male name "M."  These "shop with a cop" events are held to benefit economically disadvantaged students, which A.P. was clearly not. Mrs. Washington told A.P. that she chose her for this event because she was her favorite student.

50.     By the end of the fall semester the unaddressed bullying, unresolved academic issues, and distress caused by Mrs. Washington's continuing promotion of A.P. as a boy named "M," became overwhelming for A.P.

51.     During Christmas break when she was away from school, A.P. felt safe at home with her family. At home, away from school, she was not compelled to live a double life, keep secrets, endure bullying or wonder what Mrs. Washington might do next to compel A.P. to continue living with a false male identity at school with those whom Mrs. Washington had, without permission, shared the information.

52.     As Christmas break was ending, despair and a feeling of being overwhelmed set in as A.P. realized she would have to return to school where she would be under the control of Mrs. Washington, harassed and bullied by classmates, and compelled to live a double life.

53.     A.P. determined that she could no longer endure and decided to take her own life.

54.     On January 4, 2022, the first day back at school, A.P. attempted to hang herself in a bathroom stall using a string but stopped because it was painful. She tried again in the morning on January 5, 2022, using a different cord but the restroom was busy, so she resolved to try again at lunch time.

12

55.     Before she could, she was confronted by school Principal John O'Brian, Assistant Principal Courtney Schumacher, and Mrs. Washington and taken to the school office.

56.     A.P. was interrogated by school staff without her parents present. Mr. O'Brian and Mrs. Schumacher had been informed about A.P. being referred to as a boy named "M," but Mr. and Mrs. Perez had still not been contacted.

57.     Mr. O'Brian and Mrs. Schumacher asked A.P. if Mrs. Washington's actions in treating A.P. as a boy named "M" had anything to do with her attempting suicide. A.P. said that it did. Nevertheless, Mr. O'Brian and Mrs. Schumacher continued to refer to A.P. as a boy named "M."

58.     Finally, Mr. and Mrs. Perez received a call from Mrs. Washington, who up to that time had never communicated with the Perezes about their daughter being subjected to bullying or the gender identity issue. Mrs. Washington identified herself as a school counselor at Paterson Elementary School and told Mr. and Mrs. Perez that they needed to come to the school right away, "It's about A." Mrs. Washington would not provide any further information.

59.     Mr. and Mrs. Perez arrived at the school and were required to wait in the lobby for several minutes without receiving any information about their daughter.

60.   Finally, Mr. and Mrs. Perez were escorted into a room with Mrs. Washington, Mr. O'Brian, Mrs.  Schumacher, and a Clay County Schools Police officer. A.P. was in a separate office sitting with a stranger filling out a survey.

61.   Mr. and Mrs. Perez were told that A.P. had tried to commit suicide by hanging herself in the school restroom and was being involuntarily committed to a psychiatric hospital under the Baker Act.

62.   Having heard nothing from Mrs. Washington or anyone else at the District that A.P. had been bullied, identified as a boy by Mrs. Washington, and subject to private counseling sessions with Mrs. Washington during which transgender issues were discussed, Mr. and Mrs. Perez were shocked by this revelation.

63.   When the Perezes asked why this happened, Mrs. Washington responded, "Because of her gender identity issue." Mrs. Washington claimed that A.P. wanted to be referred to as a male named "M." (contrary to the actual conversation with A.P.) and that her parents would not be in agreement with these changes because of their Catholic beliefs.

64.   Mrs. Washington thereby affirmed her understanding that the Perez family adhered to sincerely held religious beliefs that were incompatible with a girl being falsely identified as a male with a male name.

65.     Mr. Perez stated that this was the first he had heard about A.P. having any issue with her sex, since he had heard nothing from the school and A.P. had not spoken about or exhibited any signs of gender confusion at home.

66.     In fact, just before the incident A.P. had told her mother that she believed that people who say they are transgender have a problem with their minds because "if you're a boy, you're a boy, if you're a girl, you're a girl."

67.     At the meeting on January 5, 2022, Mrs. Washington told Mr. and Mrs. Perez for the first time that she had been meeting privately with A.P. on a weekly basis during which time Defendant Washington discussed transgender issues.

68.     During the January 5, 2022 meeting, 12-year-old A.P. was only able to briefly see her parents before being placed alone in the back of a police car and driven to the hospital. She was scared when she was forced to travel with the police and be admitted to the hospital without her parents.

69.     At the January 5, 2022 meeting, Mrs. Schumacher told Mr. and Mrs. Perez that school officials were "not required" to tell the parents about the meetings with their 12-year-old daughter related to her questions about her sex and being treated as a boy with a male name. Mrs. Schumacher claimed that "confidentiality issues" prohibited District personnel from notifying parents regarding their children's questions or conflicts about their sex and wanting to identify as something other than their sex.

15

70.     Plaintiffs understood Mrs. Schumacher's comment that school officials were "not required" to tell parents about the private meetings with Mrs. Washington to mean that the District had a policy such that District staff had been instructed to not notify parents about information related to their children's well-being, *i.e.,* conflicts about sex or gender identity.

71.     Mrs. Schumacher's statements about "confidentiality issues" contradict published information on Clay County Schools' Webpage. A document entitled "Understanding Confidentiality" is addressed to parents of children receiving counseling at school. A true and correct copy of the "Understanding Confidentiality" document is attached to this Complaint, marked as Exhibit A and incorporated herein by reference as if set forth in full.

72.     The "Understanding Confidentiality" document specifically states:

> Children seen in individual sessions (except under certain conditions) **are not legally entitled to confidentiality** (also called privilege); **their parents have this right**. However, unless children feel they have some privacy in speaking with a counselor, the benefits of therapy may be lost. Therefore, it is necessary to work out an arrangement in which children feel that their privacy is generally being respected, at the same time **that parents have access to critical information**. This agreement **must have the understanding and approval of the parents** or other responsible adults and of the child in therapy.

Exhibit A, p. 1 (emphases added).

73.     Mr. and Mrs. Perez were never even informed that their daughter was being seen in individual sessions with Mrs. Washington, let alone given the chance to reach an agreement regarding confidentiality as required in the document.

74.     Plaintiffs are informed and believe and based thereon allege that the "confidentiality issues" Mrs. Schumacher alluded to were part of a District legislative policy action sanctioned by the School Board and implemented by Mr. Broskie that directs District staff that parents are not to be told when their child asserts a discordant gender identity and are identified as something other than their sex at school, including with alternate names and pronouns, unless the child approves of the transmission of the information to their parents. ("*De Facto* Policy").

75.     At the meeting on January 5, 2022, Mr. Perez made it clear that as practicing Roman Catholics he and Mrs. Perez did not consent to their daughter being treated as a male, changing A.P.'s name, identity, and pronouns, and that such actions are directly contrary to biological reality and the family's religious beliefs which permeate all of their lives.

76.     On January 10, 2022, Mr. Perez had a phone conversation with Mrs. Washington. She said that she did not see anything wrong with calling A.P. "M." She also said she did not see anything wrong with not telling Mr. and Mrs. Perez because, Mrs. Washington claimed falsely, A.P. asked her not to say anything. Mr. Perez specifically asked Mrs. Washington to give him the reason for the lack of

17

parental notification. Mrs. Washington said she needed to call back with someone from the administration, signaling that she was operating pursuant to the *De Facto* Policy and needed further guidance from Mr. Broskie or others.

77.    On January 14, 2022, Mr. Perez met with Mrs. Schumacher and asked her about the lack of parental notification about the meetings and the unauthorized interactions with A.P. using a false male name and pronouns. Mrs. Schumacher repeated her earlier statement that "confidentiality issues" prevented District staff from notifying Mr. and Mrs. Perez.

78.    Mrs. Schumacher thus twice confirmed in conversations with Mr. Perez the existence of the *De Facto* Policy that required that District staff not notify parents about their children's gender identity issues unless the child authorizes it.

79.    A.P. continued to be the subject of bullying and harassment even after being released from the hospital and placed on homebound study. On January 21, 2022, Mr. Perez went to Paterson Elementary to pick up A.P.'s schoolwork. On top of one of the binders containing A.P.'s schoolwork was a note: "cheer up you beautiful loser." Mr. Perez asked Mr. O'Brian to investigate the harassing note. Mr. O'Brian replied that no school employees who handled the binder saw the note.

80.    Although she remained an enrolled student at Paterson Elementary while on hospital homebound, A.P. was intentionally excluded from her sixth-grade promotion ceremony. She was not properly informed of the procedures to sign up

18

for the ceremony. At the ceremony, which the Perez family viewed online, A.P.'s name was not read as one of the students being promoted nor listed as a student who qualified for an Elite award. Defendants' actions in intentionally excluding A.P. from the promotion ceremony or even mentioning her as a graduate caused A.P. further distress.

### School Board Policies and Parents' Bills of Rights

81.    On November 8, 2008, the School Board enacted Policy 1.11 ("Anti-Bullying Policy") which addresses bullying and harassment and prescribes procedures for addressing instances of bullying, such as that being endured by A.P. A true and correct copy of the Anti-Bullying Policy as amended in 2019 is attached to this Complaint, marked as Exhibit B and incorporated by reference.

82.    The Anti-Bullying Policy prohibits bullying and harassment, *inter alia*, during any educational program or activity conducted by the School Board; during any school-related or school-sponsored program or activity and when in route to school aboard a school bus or at a school bus stop.

83.    The Anti-Bullying Policy requires all District faculty and staff to report any allegations of bullying or violations of the policy to the appropriate District administrators and encourages students to report allegations of bullying or harassment to appropriate administrators. (Exhibit B, p. 5, Sections E2 and E3).

84.   The Anti-Bullying Policy requires that reports of bullying or harassment be investigated by administrative staff and, in accordance with requirements from the Florida Department of Education, that parents of the parties involved be notified within 24 hours of the report. (Exhibit B, p. 7 Section F4).

85.   A.P. reported incidents of bullying at the beginning of the 2021-2022 school year to the school bus driver and to Mrs. Washington.

86.   On more than one occasion, A.P. reported to Mrs. Washington additional incidents of bullying resulting from Mrs. Washington's unauthorized disclosure of the false male name to A.P.'s peers.

87.   Plaintiffs are informed and believe that Mrs. Washington did not report the allegations of bullying A.P. disclosed to her. If they were reported, no investigation was made as required by the Anti-Bullying Policy.

88.   Mr. and Mrs. Perez did not receive any notification of any reports of bullying as required under the Anti-Bullying Policy related to the instances of bullying reported by A.P. to Mrs. Washington and the school bus driver.

89.   Plaintiffs are informed and believe that Defendants School Board and/or Mr. Broskie failed to properly supervise and train District employees regarding the requirements of reporting of bullying or harassment so that District employees permitted bullying reported by A.P. to continue without consequences and without notification to Mr. and Mrs. Perez.

90.     As a result of Defendants' failure to supervise and train District employees and Mrs. Washington's failure to comply with the Anti-Bullying Policy, Mr. and Mrs. Perez were deprived of critical information regarding their daughter's mental health and well-being before A.P. became so overwhelmed that she attempted suicide.

91.     The Parents' Bill of Rights, HB 241, became law in Florida on July 1, 2021. The Parents' Bill of Rights was in full force and effect at all times relevant to the allegations of this Complaint.

92.     The Parents' Bill of Rights reserves all parental rights, including the rights to direct education, upbringing, moral or religious training, and to make health care decisions for minor children to their parents "without obstruction or interference from the state, any of its political subdivisions, any other governmental entity, or any other institution." Florida Statutes § 1014.04.

93.     The Parents' Bill of Rights prescribes that "important information relating to a minor child should not be withheld, either inadvertently or purposefully, from his or her parent, including information relating to the minor child's health, well-being, and education, while the minor child is in the custody of the school district." Florida Statutes § 1014.02.

94. Florida Statutes § 1014.02 further provides that "it is necessary to establish a consistent mechanism for parents to be notified of information relating to the health and well-being of their minor children."

95. Florida Statutes § 1014.03 provides:

The state, any of its political subdivisions, any other governmental entity, or any other institution may not infringe on the fundamental rights of a parent to direct the upbringing, education, health care, and mental health of his or her minor child without demonstrating that such action is reasonable and necessary to achieve a compelling state interest and that such action is narrowly tailored and is not otherwise served by a less restrictive means.

96. The Parents' Bill of Rights, therefore, incorporates the judicial strict scrutiny test for constitutional challenges to violations of fundamental rights.

97. Defendant School Board, a political subdivision of the state subject to the Parents' Bill of Rights, failed to enact a formal policy or other "consistent mechanism" to notify parents of information relating to the health and well-being of their minor children in 2021 as required by the law. Instead, Plaintiffs are informed and believe that school administrators, with the knowledge and approval of the School Board, developed and implemented the *De Facto* Policy as a districtwide directive which proscribed notice to parents unless children approve.

98. At a School Board meeting on June 21, 2022, the District's legal counsel confirmed that the Board had not adopted a formal policy pursuant to the Parents' Bill of Rights up to that time but had been following protocols and

procedures present throughout the District's policies and procedures. Plaintiffs are informed and believe that those policies and procedures included the *De Facto* Policy.

99.    At the June 21, 2022 meeting, the Board discussed adoption of a policy in response to the Parents' Bill of Rights in Education, which became effective on July 1, 2022 and requires additional notification and other policies to protect parental rights. The School Board's counsel said that the notice required under the 2021 Parents' Bill of Rights was incorporated into the new Policy ("2022 Policy"). The 2022 Policy, Section 1.15, was formally adopted by the School Board on August 4, 2022. A true and correct copy of the 2022 Policy is attached to this Complaint, marked as Exhibit C and incorporated herein by reference.

100.   Section 1.15D incorporates the *De facto* Policy's provision that parents are not to be notified if their child does not approve:

D. Nothing contained in this Policy or in procedures drafted to implement this Policy, shall require any School District personnel to inform a parent of communications between a student and school personnel if it is determined:

1. That the student, after being encouraged to discuss issues relating to his or her well-being with his or her parent or to facilitate discussion of the issue with the parent, indicates an unwillingness or outright refusal to enter into discussion with his/her parents concerning those matters about which the student communicated with School District personnel, and

2. That there is no change in the student's services or monitoring related to the student's mental, emotional, or physical health or well-being and

the school's ability to provide a safe and supportive learning environment for the student.

Section 1.15D1's exception to parental notification when a child is unwilling is not an enumerated exception to the parental notification required by Florida Statutes §1014.02 and the 2022 Parents' Bill of Rights in Education.

101.    Section 1.15D2's provision regarding change in a student's services or monitoring does not contain definitional standards to cabin administrator discretion. Therefore the 2022 Policy permits District personnel to continue implementing the *De Facto* Policy when a child refuses to approve of notifying his or her parents and administrators simply assert that there is no change in the student's services or monitoring.

102.    Consequently, Defendant School Board has failed to enact a policy that requires that parents be notified of information relating to the health and well-being of their minor children regardless of the child's approves as required by Florida law and the United States Constitution.

103.    Florida Statutes §1008.363(3) provides:

> Beginning with the 2021-2022 school year, any student identification card issued by a public school to students in grades 6 through 12 must include the telephone numbers for national or statewide crisis and suicide hotlines and text lines.

104.    Defendants School Board and Broskie failed to enact procedures or directives to implement the requirements of Section 1008.363(3) and/or failed to

24

train and supervise District staff to ensure compliance with Section 1008.363(3), in that A.P.'s student identification card issued for the 2021-2022 school year, her sixth grade year, did not contain the required notifications regarding crisis and suicide prevention hotlines and text lines. As a result, A.P was deprived of critical information which, if available to her, she could have utilized to seek help instead of attempting suicide.

**FIRST CAUSE OF ACTION**
**VIOLATION OF CIVIL RIGHTS, 42 U.S.C. § 1983**
**(Violation of Plaintiffs' Substantive Due Process Fundamental Parental Right to Direct the Upbringing of Their Child under the U.S. Constitution)**
**(By Mr. and Mrs. Perez individually Against all Defendants)**

105.   Plaintiffs incorporate the factual allegations in Paragraphs 16-104 by reference as if set forth in full.

106.   The Due Process Clause in the Fourteenth Amendment to the United States Constitution protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children as part of directing the education and upbringing of their children. *Pierce v. Society of Sisters*, 268 U.S. 510 (1925); *Troxel v. Granville*, 530 U.S. 57, 68 (2000). This right was recognized as fundamental for many years before Defendants engaged in the conduct that is the subject of this action. It was also memorialized in Florida Statutes as of July 1, 2021.

107.   The Due Process fundamental right of parents to make decisions concerning the care, custody, and control of their children includes the fundamental

right to direct the medical and mental health decision-making for their children. *Parham v. J. R.*, 442 U.S. 584 (1979), *Arnold v. Board of Education of Escambia County,* 880 F.2d 305 (11th Cir. 1989). This right was recognized as fundamental in the Eleventh Circuit, including Leon County, Florida, for many years before Defendants engaged in the conduct that is the subject of this action. It was also memorialized in Florida Statutes as of July 1, 2021.

### Actions by Defendant School Board

108.   Defendant School Board violated Mr. and Mrs. Perez's fundamental constitutional right to direct the upbringing of their child, including to make mental health care decisions, by knowingly and intentionally failing to enact a policy requiring that parents like Mr. and Mrs. Perez be notified of information relating to the health and well-being of their minor children, like A.P.'s conflicts regarding her sex and issues with bullying, regardless of whether the children approve, as also required by Florida's parental rights laws.

109.   Defendant School Board violated Mr. and Mrs. Perez's fundamental constitutional right to direct the upbringing of their child, including the right to make mental health care decisions, by knowingly and intentionally failing to train and supervise District staff on the requirements under the Constitution and Florida law that information related to the health and well-being of minor children must not be concealed from the child's parents.

110.  Defendant School Board's failure to properly train and supervise District staff in the requirements of parental notification exhibits deliberate indifference to the rights of Plaintiffs enumerated in the United States Constitution and Florida's parental rights laws, in that parents will be, and in Plaintiffs' case have been, denied their right to direct the upbringing of their child and direct decisions concerning her mental health and well-being with regard to A.P.'s conflicts about her sex and issues with bullying.

111.  Defendant School Board violated Mr. and Mrs. Perez's fundamental constitutional right to direct the upbringing of their child, including the right to make mental health care decisions, by sanctioning the development and implementation of the *De Facto* Policy which directed District staff to conceal from parents information related to their children's health and well-being, including in Plaintiffs' case, their daughters' conflicts regarding her sex, unless the minor child approves.

112.  Defendant School Board violated Mr. and Mrs. Perez's fundamental constitutional right to direct the upbringing of their child, including the right to make mental health care decisions, by knowingly failing to train and supervise District staff that confidentiality laws do not authorize withholding information regarding the health and well-being of their minor children like A.P. from their fit parents.

113.  The acts and omissions of Defendant School Board violated Mr. and Mrs. Perez's fundamental parental rights by depriving Mr. and Mrs. Perez of their

27

right to be informed of what was taking place with their child concerning a serious personal and mental health issue and of their right to determine and provide A.P. the mental health care and assistance she needed before she became suicidal.

### Actions by Defendant Broskie

114.   Defendant Broskie violated Mr. and Mrs. Perez's fundamental constitutional right to direct the upbringing of their child, including the right to make mental health care decisions, by knowingly and intentionally failing to train and supervise District staff on the requirements under the Constitution and Florida law that information related to the health and well-being of minor children must not be concealed from parents. As a result, information related to the health and well-being of A.P. was concealed from Mr. and Mrs. Perez.

115.   On information and belief, Defendant Broskie violated Mr. and Mrs. Perez's fundamental constitutional right to direct the upbringing of their child, including the right to make mental health care decisions, by sanctioning development of and overseeing implementation of the *De Facto* Policy which directed District staff to conceal from parents, including Mr. and Mrs. Perez, information related to their children's health and well-being, including in Plaintiffs' case, their daughters' conflicts regarding her sex, unless the minor child approves.

116.   Defendant Broskie violated Mr. and Mrs. Perez's fundamental constitutional right to direct the upbringing of their child, including the right to make

mental health care decisions, by knowingly and intentionally failing to train and supervise District staff that confidentiality laws do not authorize withholding information concerning minor children like A.P. from their fit parents.

117.   The acts and omissions of Defendant Broskie violated Mr. and Mrs. Perez's fundamental parental rights by depriving Mr. and Mrs. Perez of their right to be informed of what was taking place with their child concerning a serious personal and mental health issue and of their right to determine and provide A.P. the mental health care and assistance she needed before she became suicidal.

### Actions by Defendant Washington

118.   Defendant Washington violated Plaintiffs' fundamental right to direct the upbringing of their daughter, including making mental health decisions, when, without notice to or the consent of Mr. and Mrs. Perez, she initiated weekly private meetings with A.P. during which Mrs. Washington addressed mental health issues, created and promoted a false male identity for A.P., and promised to conceal the meetings and false male identity information from A.P.'s parents in contravention of the Constitution and Florida law.

119.   Defendant Washington violated Plaintiffs' fundamental right to direct the upbringing of their daughter, including making mental health decisions, when, in violation of District policy, she failed to report incidents of bullying reported by A.P., especially after Mrs. Washington impermissibly disclosed the male name she

was privately using for A.P. to A.P.'s peers, and failed to inform Mr. and Mrs. Perez of the incidents.

120.   As a result of Ms. Washington's actions, Plaintiffs were denied information they needed to make decisions regarding their daughter's mental health and well-being before she became suicidal.

### Allegations regarding all Defendants

121.   Plaintiffs' constitutionally protected fundamental right to direct the upbringing of their child, including the right to make medical and mental health decisions, was violated as the plainly obvious consequence of Defendants substituting their judgment for the judgment of A.P.'s fit parents by, *inter alia,* a) failing to implement a parental notification policy as required under Florida law; b) failing to train and supervise District staff regarding parental notification requirements; c) directing District staff that students are entitled to confidentiality even toward their parents when they raise issues related to gender identity; d) meeting surreptitiously with A.P. to discuss mental health issues; e) withholding mental health information regarding A.P. from Mr. and Mrs. Perez; and taking or failing to take other actions of which Plaintiffs are presently unaware.

122.   Defendants cannot assert a compelling interest for disregarding Plaintiffs' long-established fundamental constitutional right, confirmed by Florida

law, to direct the upbringing, care, and education of their children, and Defendants' prohibition against parental notification is not narrowly tailored.

123. Defendants' violation of Plaintiffs' fundamental constitutional rights has caused Plaintiffs undue hardship.

**Prayer for Relief:**

WHEREFORE, Plaintiffs request the following relief:

1. A declaration that Defendants School Board and Broskie violated Plaintiffs' fundamental rights as parents to direct the upbringing of their child under the United States Constitution as set forth in Paragraphs 108-117.

2. A declaration that Defendant Washington violated Plaintiffs' fundamental rights as parents to direct the upbringing of their child under the United States Constitution as set forth in Paragraphs 118-120

3. For nominal damages;

4. For compensatory damages according to proof for the injuries caused by Defendants' acts and omissions, including a) emotional distress, b) ongoing emotional and psychological damage to A.P. requiring therapeutic interventions to rebuild the trust between A.P. and her parents which was damaged by the actions of Defendants, c) ongoing emotional and psychological damage to the family dynamic, requiring therapeutic interventions to rebuild trust between parents and child which

was damaged by the actions of Defendants, d) ongoing damage for loss of educational opportunities, e) and damages for other injuries as proven at trial;

5.    For attorneys' fees and costs under 42 U.S.C. § 1988;

6.    For such other relief as the Court deems proper.

**SECOND CAUSE OF ACTION**
**VIOLATION OF CIVIL RIGHTS, 42 U.S.C. § 1983**
**(Violation of Plaintiffs' Substantive Due Process Right to Familial Privacy**
**Under the U.S. Constitution)**
**(By Mr. and Mrs. Perez individually Against All Defendants)**

124.    Plaintiffs incorporate the factual allegations in paragraphs 16-104 by reference as if set forth in full.

125.    The Due Process Clause in the Fourteenth Amendment to the United States Constitution protects the sanctity of the family as an institution deeply rooted in this Nation's history and tradition, through which moral and cultural values are passed down to children. *Moore v. East Cleveland*, 431 U.S. 494, 503-504 (1977). The Constitution protects the private realm of the family from interference by the state. *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944); *Arnold v. Board of Education of Escambia County,* 880 F.2d 305 (11th Cir. 1989). This right was well established by Supreme Court and Eleventh Circuit precedent at the time of the Defendants' conduct as alleged.

126.    The protected right of familial privacy includes the right of parents, free from state interference, to teach their children values and standards which the parents

deem desirable and to counter influences on children the parents find inimical to their religious beliefs or the values they wish instilled in their children. *Arnold v. Board of Education of Escambia County,* 880 F.2d 305, 313 (11th Cir. 1989).

**Actions by the School Board That Interfered with Familial Privacy**

127.    Defendant School Board interfered with Mr. and Mrs. Perez's fundamental constitutional right to familial privacy and invaded the private realm of their family by intentionally failing to enact a policy requiring that parents be notified of information relating to the health and well-being of their minor children regardless of whether the children approve.

128.    Defendant School Board interfered with Mr. and Mrs. Perez's fundamental constitutional right to familial privacy and invaded the private realm of their family by purposefully and intentionally failing to supervise and train District staff on the requirements under the United States Constitution and Florida law that information related to the health and well-being of minor children must not be concealed from parents.

129.    Defendant School Board interfered with Mr. and Mrs. Perez's fundamental constitutional right to familial privacy and invaded the private realm of their family by sanctioning development and implementation of the *De Facto* Policy which directed District staff to conceal from parents information related to their

children's health and well-being, including a child's gender identity, unless the minor child approves.

130.  Defendant School Board interfered with Mr. and Mrs. Perez's fundamental constitutional right to familial privacy and invaded the private realm of their family by failing to supervise and train District staff that confidentiality laws do not authorize withholding important information concerning a minor child from their fit parents.

131.  By failing to enact a parental notification policy, failing to properly supervise and train District staff concerning the need to share information related to the health and well-being of minor children with their parents, and sanctioning the *De Facto* Policy, the School Board interfered with Mr. and Mrs. Perez's right to teach their daughter important values and standards they deem desirable and counter undesirable influences by preventing them from receiving information necessary for them to exercise that right with regard to A.P.'s conflicts regarding gender identity and bullying issues.

**Actions by Defendant Broskie that Interfered with Familial Privacy**

132.  Defendant Broskie interfered with Mr. and Mrs. Perez's fundamental constitutional right to familial privacy and invaded the private realm of their family by failing to supervise and train District staff on the requirements under the

34

Constitution and Florida law that information related to the health and well-being of minor children must not be concealed from parents.

133.   Defendant Broskie interfered with Mr. and Mrs. Perez's fundamental constitutional right to familial privacy and invaded the private realm of their family by sanctioning development of and overseeing implementation of the *De Facto* Policy which directed District staff to conceal from parents information related to their children's health and well-being, including a child's gender identity, unless the minor child approves.

134.   Defendant Broskie interfered with Mr. and Mrs. Perez's fundamental constitutional right to familial privacy by failing to supervise and train District staff that confidentiality laws do not authorize withholding information concerning minor children from their fit parents.

135.   By sanctioning development and overseeing implementation of the *De Facto* Policy, and  failing to properly supervise and train District staff concerning the need to share information related to the health and well-being of minor children with their parents, Mr. Broskie interfered with Mr. and Mrs. Perez's right to teach their daughter important values and standards they deem desirable and counter undesirable influences by preventing them from receiving information necessary for them to exercise that right with regard to A.P.'s conflicts regarding gender identity and bullying issues.

35

**Actions by Defendant Washington that Interfered with Familial Privacy**

136. Defendant Washington interfered with Mr. and Mrs. Perez's fundamental right to familial privacy and invaded the private realm of their family when, without notice to or the consent of Mr. and Mrs. Perez, she initiated weekly private meetings with A.P. during which Mrs. Washington addressed mental health issues, created and promoted a false male identity for A.P., and promised to conceal the meetings and gender identity information from Mr. and Mrs. Perez. Mrs. Washington's actions interfered with Mr. and Mrs. Perez's right to teach their daughter important values and standards they deem desirable and counter undesirable influences by preventing them from receiving information necessary for them to exercise that right with regard to A.P.'s conflicts regarding gender identity and bullying issues.

137. Defendant Washington interfered with Mr. and Mrs. Perez's fundamental right to familial privacy and invaded the private realm of their family when, in violation of District policy, she failed to report incidents of bullying reported by A.P., especially after Mrs. Washington impermissibly disclosed the male name she was using for A.P. to A.P.'s peers, and failed to inform Mr. and Mrs. Perez of the incidents. Mrs. Washington's actions interfered with Mr. and Mrs. Perez's right to teach their daughter important values and standards they deem desirable and counter undesirable influences by preventing them from receiving information

36

necessary for them to exercise that right with regard to A.P.'s conflicts regarding gender identity and bullying issues.

### Allegations regarding all Defendants

138.   Defendants cannot assert a compelling state interest for disregarding requirements for establishing procedures for parental notification, failing to train and/or supervise employees regarding parental notification and bullying response, and developing the *De Facto* Policy that violate Plaintiffs' constitutional right to familial privacy. Defendants' prohibitions against parental notification and unauthorized involvement in children's mental health decisions related to gender identity are not narrowly tailored.

139.   Defendants' deliberate indifference to and reckless disregard for the rights of Mr. and Mrs. Perez and A.P. to familial privacy without state interference, Defendants' obligations under the District Bullying Policy and the requirements of the Parents' Bill of Rights led to A.P. being coerced into keeping secrets and living a double life to the point of attempting suicide twice on school property, causing permanent injury to A.P. and damage to the familial relationship between A.P. and her parents.

### Prayer for Relief:

WHEREFORE, Plaintiffs request the following relief:

A.     A declaration that the School Board and Mr. Broskie have interfered with Mr. and Mrs. Perez's rights to familial privacy under the United States Constitution as set forth in Paragraphs 127-135.

B.     A declaration that Mrs. Washington has interfered with Mr. and Mrs. Perez's rights to familial privacy under the United States Constitution as set forth in Paragraphs 136-137.

C. For nominal damages.

D.     For compensatory damages according to proof for the injuries caused by Defendants' acts and omissions, including a) emotional distress, b) ongoing emotional and psychological damage to A.P. requiring therapeutic interventions to rebuild the trust between her and her parents which was damaged by the actions of Defendants, c) ongoing emotional and psychological damage to the family dynamic, requiring therapeutic interventions to rebuild trust between parents and child which was damaged by the actions of Defendants, d) ongoing damage for loss of educational opportunities, and other injuries as proven at trial.

E.     For attorneys' fees and costs under 42 U.S.C. § 1988.

F.     For such other relief as the Court deems proper.

**THIRD CAUSE OF ACTION**
**VIOLATION OF CIVIL RIGHTS, 42 U.S.C. § 1983**
**(Violation of Plaintiffs' Substantive Due Process Right to Familial Privacy**
**Under the U.S. Constitution)**
**(By Mr. and Mrs. Perez on behalf of A.P. Against All Defendants)**

140.    Plaintiffs incorporate the factual allegations in paragraphs 16-104 by reference as if set forth in full.

141.    The Due Process Clause in the Fourteenth Amendment to the United States Constitution protects the sanctity of the family as an institution deeply rooted in this Nation's history and tradition, through which moral and cultural values are passed down to children. *Moore v. East Cleveland*, 431 U.S. 494, 503-04 (1977). The Constitution protects the private realm of the family from interference by the state. *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944); *Arnold v. Board of Education of Escambia County,* 880 F.2d 305, 313 (11th Cir. 1989). This right was well established by Supreme Court and Eleventh Circuit precedent at the time of the Defendants' conduct as alleged.

142.    The protected right of familial privacy includes the right of parents to, free from state interference, teach their children and their children to be taught by their parents, values and standards which the parents deem desirable and to counter influences on children the parents find inimical to their religious beliefs or the values they wish instilled in their children. *Arnold v. Board of Education of Escambia County,* 880 F.2d 305, 313 (11th Cir. 1989).

**Actions by the School Board That Interfered with Familial Privacy**

143. Defendant School Board interfered with A.P.'s fundamental constitutional right to familial privacy and invaded the private realm of her family by failing to enact a policy requiring that parents be notified of information relating to the health and well-being of their minor children as also required by Florida's Parents' Bill of Rights.

144. Defendant School Board interfered with A.P.'s fundamental constitutional right to familial privacy and invaded the private realm of her family by failing to supervise and train District staff that the United States Constitution and Florida law proscribe concealing from parents information related to the health and well-being of their minor children.

145. Defendant School Board interfered with A.P.'s fundamental constitutional right to familial privacy and invaded the private realm of her family by sanctioning development and implementation of the *De Facto* Policy which directed District staff to conceal from parents information related to their children's health and well-being, including a child's gender identity, unless the minor child approves.

146. Defendant School Board interfered with A.P.'s fundamental constitutional right to familial privacy and invaded the private realm of her family

by failing to supervise and train District staff that confidentiality laws do not authorize withholding information concerning minor children from their fit parents.

147.   By failing to enact the required parental notification policy, failing to appropriately supervise and train District staff concerning the need to share information related to the health and well-being of minor children with their parents, and sanctioning development and implementation of the *De Facto* Policy, Defendant School Board interfered with A.P.'s fundamental constitutional right to familial privacy and invaded the private realm of her family by preventing A.P. from receiving from her parents assistance regarding A.P.'s conflicts about her sex and how to address bullying issues based on the values and standards her parents deem desirable. A.P. was also deprived of her right to receive teaching from her parents regarding how to use the family's shared values to counter undesirable influences related to A.P.'s conflicts about her sex and how to address bullying.

**Actions by Defendant Broskie that Interfered with Familial Privacy**

148.   Defendant Broskie interfered with A.P.'s fundamental constitutional right to familial privacy and invaded the private realm of her family by failing to supervise and train District staff on the requirements under the Constitution and Florida law that information related to the health and well-being of minor children must not be concealed from parents.

41

149.   Defendant Broskie interfered with A.P.'s fundamental constitutional right to familial privacy and invaded the private realm of her family by sanctioning development of and overseeing implementation of the *De Facto* Policy which directed District staff to conceal from parents information related to their children's health and well-being, including a child's gender identity, unless the minor child approves.

150.   Defendant Broskie interfered with A.P.'s fundamental constitutional right to familial privacy and invaded the private realm of her family by failing to train or supervise District staff that confidentiality laws do not authorize withholding information concerning minor children from  their fit parents.

151.   By failing to supervise and train District staff concerning the need to share information related to the health and well-being of minor children with parents and sanctioning development and implementation of the *De Facto* Policy, Defendant Broskie interfered with A.P.'s fundamental constitutional right to familial privacy and invaded the private realm of her family by preventing A.P. from receiving from her parents assistance regarding A.P.'s conflicts about her sex and how to address bullying issues based on the values and standards her parents deem desirable.  A.P. was also deprived of her right to receive teaching from her parents regarding how to use the family's shared values to counter undesirable influences related to A.P.'s conflict about her sex and how to address bullying.

**Actions by Defendant Washington that Interfered with Familial Privacy**

152.   Defendant Washington interfered with A.P.'s right to familial privacy and invaded the private realm of her family when, she initiated weekly private meetings with A.P. during which Mrs. Washington addressed mental health issues, created and promoted a false male identity for A.P., and promised to conceal the meetings and gender identity information from A.P.'s parents.

153.   Mrs. Washington's actions prevented A.P. from receiving from her parents assistance regarding A.P.'s conflicts about her sex based on the values and standards her parents deem desirable. A.P. was also deprived of her right to receive teaching from her parents regarding how to use the family's shared values to counter undesirable influences related to A.P.'s conflicts about her sex.

154.   Defendant Washington interfered with A.P.'s fundamental right to familial privacy and invaded the private realm of her family when, in violation of District policy, she failed to report incidents of bullying reported by A.P., especially after Mrs. Washington impermissibly disclosed the false male name she was using for A.P. to A.P.'s peers and failed to inform Mr. and Mrs. Perez of the incidents.

155.   Mrs. Washington's actions interfered with A.P.'s fundamental right to familial privacy and invaded the private realm of her family by preventing A.P. from receiving from her parents assistance regarding A.P.'s distress over how to address bullying issues based on the values and standards her parents deem desirable. A.P.

43

was also deprived of her right to receive assistance from her parents regarding how to use the family's shared values to counter undesirable influences related to A.P.'s distress over how to address bullying.

### Allegations regarding all Defendants

156.   Defendants cannot assert a compelling state interest for disregarding requirements for establishing procedures for parental notification, failing to train and/or supervise employees regarding parental notification and bullying response, and developing the *De Facto* Policy that violate A.P.'s constitutional right to familial privacy. Defendants' prohibitions against parental notification and unauthorized involvement in children's mental health decisions related to gender identity are not narrowly tailored.

157.   Defendants' deliberate indifference to and reckless disregard for the rights of A.P. to familial privacy without state interference, Defendants' obligations under the District Bullying Policy and the requirements of the Parents' Bill of Rights led to A.P. being coerced into keeping secrets and living a double life to the point of attempting suicide twice on school property, causing permanent injury to A.P. and damage to the familial relationship between A.P. and her parents.

### Prayer for Relief:

WHEREFORE, Plaintiffs request the following relief:

A.    A declaration that the School Board and Mr. Broskie have interfered with A.P.'s right to familial privacy under the United States Constitution as set forth in Paragraphs 143-151

B.    A declaration that Mrs. Washington has interfered with A.P.'s right to familial privacy under the United States Constitution as set forth in Paragraphs 152-155.

C.    For nominal damages.

D.    For compensatory damages according to proof for the injuries caused by Defendants' acts and omissions, including a) emotional distress, b) ongoing emotional and psychological damage to A.P. requiring therapeutic interventions to rebuild the trust between her and her parents which was damaged by the actions of Defendants, c) ongoing emotional and psychological damage to the family dynamic, requiring therapeutic interventions to rebuild trust between parents and child which was damaged by the actions of Defendants, d) ongoing damage for loss of educational opportunities, and other injuries as proven at trial.

E.    For attorneys' fees and costs under 42 U.S.C. § 1988.

F.    For such other relief as the Court deems proper.

## FOURTH CAUSE OF ACTION
### Violation of Civil Rights, 42 U.S.C. § 1983
### (Violation of Plaintiffs' Right to Free Exercise of Religion
### Under the U.S. Constitution)
### (By Mr. and Mrs. Perez individually Against Defendant Washington)

158.   Plaintiffs incorporate the factual allegations of paragraphs 16-104 by reference as if set forth in full.

159.   The Free Exercise Clause of the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, prohibits Defendant from abridging Mr. and Mrs. Perez's right to free exercise of religion. *Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520 (1993); *Cambridge Christian Sch. v. Fla. High Sch. Athletic Ass'n* 942 F.3d 1215 (11th Cir. 2019). This right was well-established in Supreme Court and Eleventh Circuit precedent at the time of the actions related in this Complaint.

160.   Mr. and Mrs. Perez are practicing Roman Catholics whose faith informs all of their lives. They have sincerely held religious beliefs that include: 1) human beings are created male or female and the natural created order regarding human sexual identity cannot be changed; 2) all people are to be treated with compassion, which includes refraining from misrepresenting an individual's natural biological and created identity as either a male or a female;  3) individuals are to speak the truth, including speaking the truth regarding matters of sexual identity as a male or female; 4) Children are to respect their parents and other adult authority figures; 5)

46

Parents have the non-delegable duty to introduce and teach their children about issues related to sexual identity and personal relationships.

161.   Mrs. Washington was aware of the family's sincerely held religious beliefs and that treating their daughter as a boy and untruthfully using a male name and pronouns would violate their sincerely held religious beliefs.

162.   Mrs. Washington's concealment of, *inter alia*, her secret meetings with A.P., discussion of mental health issues, treating A.P. as a boy named "M," promising secrecy, impliedly approving of rebelling against Biblical, Church and parental teachings, and ignoring bullying being suffered by A.P. prevented Mr. and Mrs. Perez from acting pursuant to their sincerely held religious beliefs by denying them the information they needed to counsel A.P. regarding  conflicts about her sex and responding to the bullying  in a manner consistent with their faith.

163.   Mrs. Washington's actions also significantly burdened Mr. and Mrs. Perez's sincerely held religious beliefs by preventing them from acting pursuant to their religious beliefs that it is the parents who have the duty to train their children regarding human sexual identity and the unchangeable natural created order of humans as male and female. Mrs. Washington's adherence to the *De Facto* Policy of concealing information from parents meant that Mrs. Washington introduced A.P. to issues regarding human sexuality and the idea that the concepts of male and female are changeable. Mr. and Mrs. Perez were, therefore, denied the ability to use

faith-informed principles to introduce A.P. to the subject of human sexuality and counter undesirable influences presented to A.P. at school leading to gender confusion and significant emotional distress.

164.   Defendant's actions have caused a direct and immediate conflict with Mr. and Mrs. Perez's religious beliefs by preventing Mr. and Mrs. Perez from being informed of the mental health issues A.P. was experiencing and seeking counseling and guidance for A.P. in a manner that is consistent with the beliefs held by Mr. and Mrs. Perez and by A.P. herself before A.P. became suicidal.

165.   Defendant's actions are neither neutral nor generally applicable, but rather specifically and discriminatorily target the religious beliefs and viewpoint of Mr. and Mrs. Perez and thus expressly constitute a substantial burden on sincerely held religious beliefs that are contrary to Defendant's viewpoint regarding the nature of the created order.

166.   No compelling state interest justifies the burdens Defendant imposed on Mr. and Mrs. Perez's rights to the free exercise of religion.

167.   Defendant's actions are not the least restrictive means to accomplish any permissible government purpose Defendant seeks to serve.

168.   Defendant's violation of Mr. and Mrs. Perez's rights to free exercise of religion has caused Mr. and Mrs. Perez to suffer undue and actual hardships.

169.    Defendant's violation of Mr. and Mrs. Perez's rights to free exercise of religion has caused Plaintiffs to suffer irreparable injury. Plaintiffs have no adequate remedy at law to correct the continuing deprivation of their most cherished constitutional liberties.

**Prayer for Relief**

WHEREFORE, Plaintiffs request the following relief:

A.    A declaration that Defendant has violated Mr. and Mrs. Perez's rights to free exercise of religion under the United States Constitution as set forth in Paragraphs 159-169.

B.    For nominal damages.

C.    For compensatory damages according to proof for the injuries caused by Defendant's acts and omissions, including a) emotional distress, b) ongoing emotional and psychological damage to A.P. requiring therapeutic interventions to rebuild the trust between her and her parents which was damaged by the actions of Defendant, c) ongoing emotional and psychological damage to the family dynamic, requiring therapeutic interventions to rebuild trust between parents and child which was damaged by the actions of Defendant, d) ongoing damage for loss of educational opportunities, and other injuries as proven at trial.

D.    For attorneys' fees and costs under 42 U.S.C. § 1988.

E.    For such other relief as the Court deems proper.

**FIFTH CAUSE OF ACTION**
**Violation of Civil Rights, 42 U.S.C. § 1983**
**(Violation of Plaintiffs' Right to Free Exercise of Religion**
**Under the U.S. Constitution)**
**(By Mr. and Mrs. Perez on behalf of A.P. Against Defendant**
**Washington)**

170.  Plaintiffs incorporate the factual allegations of paragraphs 16-104 by reference as if set forth in full.

171.  The Free Exercise Clause of the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, prohibits Defendant from abridging A.P.'s right to free exercise of religion. *Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520 (1993); *Cambridge Christian Sch. v. Fla. High Sch. Athletic Ass'n* 942 F.3d 1215 (11th Cir. 2019). This right was well-established in Supreme Court and Eleventh Circuit precedent at the time of the actions related in this Complaint.

172.  A.P. has sincerely held religious beliefs that include: 1) human beings are created male or female and that the natural created order regarding human sexuality cannot be changed; 2) people are to speak the truth, including speaking the truth regarding matters of sexual identity as a male or female and 3) as a child she is to respect her parents and other adult authority figures.

173.  Mrs. Washington was aware that A.P. was Catholic. Ms. Washington was aware that treating A.P. as a boy and using a false name would conflict with A.P.'s, as well as her family's, sincerely held religious beliefs. Nevertheless, she

initiated and persisted in treating A.P. as a boy and using a false male name. Because Mrs. Washington is an adult authority figure who A.P. believes must be respected, her actions coerced A.P. to participate in a lie about her identity, a lie that contradicted her sincerely held religious belief that human beings are created male and female, which cannot change.

174.   Mrs. Washington's actions in promising, without a prompting from A.P., that she would not tell A.P.'s parents about the private meetings and her treatment of A.P. as a boy with a male name substantially burdened A.P.'s free exercise of her sincerely held religious beliefs. Mrs. Washington's actions communicated to A.P. that she need not respect her parents' authority or seek their permission to make consequential decisions, which violates A.P.'s beliefs that children are to respect their parents' decisions regarding the child's health and well-being.

175.   Mrs. Washington's actions in sharing details regarding her experience of getting kicked out of church for inappropriate attire substantially burdened A.P.'s free exercise of her sincerely held religious beliefs by transmitting a message from an adult authority figure that church teachings on issues like modesty can be disregarded contrary to A.P.'s belief that her parents must be respected.

176.   Mrs. Washington's actions also significantly burdened A.P.'s sincerely held religious beliefs by preventing her from acting on her belief that she must abide

by church teachings  and respect Mrs. Washington as an adult authority figure by creating an irreconcilable conflict between her church teaching concerning  the unchanging created order of human sexuality as male and female  and Mrs. Washington's message that identity as a male or female is changeable according to an individual's perceptions.

177.   Defendant's actions are neither neutral nor generally applicable, but rather specifically and discriminatorily target the religious beliefs and viewpoint of A.P. and thus expressly constitute a substantial burden on A.P.'s ability to exercise and act on her sincerely held religious beliefs.

178.   No compelling state interest justifies the burdens Defendant imposed on A.P.'s rights to the free exercise of religion.

179.   Defendant's actions are not the least restrictive means to accomplish any permissible government purpose Defendant seeks to serve.

180.   Defendant's violation of A.P.'s rights to free exercise of religion has caused A.P. to suffer undue and actual hardships.

181.   Defendant's violation of A.P.'s right to free exercise of religion has caused A.P. to suffer irreparable injury. A.P. has no adequate remedy at law to correct the continuing deprivation of her most cherished constitutional liberties.

**Prayer for Relief**

WHEREFORE, Plaintiffs request the following relief:

A.    A declaration that Mrs. Washington has violated A.P.'s right to free exercise of religion under the United States Constitution as set forth in Paragraphs 173-181.

B.    For nominal damages.

C.    For compensatory damages according to proof for the injuries caused by Defendants' acts and omissions, including a) emotional distress, b) ongoing emotional and psychological damage to A.P. requiring therapeutic interventions to rebuild the trust between her and her parents which was damaged by the actions of Defendants, c) ongoing emotional and psychological damage to the family dynamic, requiring therapeutic interventions to rebuild trust between parents and child which was damaged by the actions of Defendants, d) ongoing damage for loss of educational opportunities, and other injuries as proven at trial.

D.    For attorneys' fees and costs under 42 U.S.C. § 1988.

E.    For such other relief as the Court deems proper.

**SIXTH CAUSE OF ACTION**
**Violation of Civil Rights, 42 U.S.C.  § 1983**
**(Violation of Plaintiffs' Procedural Due Process Rights**
**Under the U.S. Constitution)**
**(By Mr. and Mrs. Perez individually Against Defendants School Board and**
**Broskie)**

182.   Plaintiffs incorporate the factual allegations of paragraphs 16-104 by reference as if set forth in full.

183.   The Due Process Clause of the Fourteenth Amendment protects against government action that impairs constitutional rights without adequate procedural safeguards. Procedural due process forbids the government from depriving Plaintiffs of their constitutional rights except through some individualized process. The Due Process Clause requires the government to consider the significance of Plaintiffs' private interest, the risk that the government's procedures might erroneously deprive Plaintiffs of that interest, the extent to which different procedures might reduce that risk, and the government's reason, if any, for employing alternative methods of protecting Plaintiffs' rights. *Mathews v. Eldridge*, 424 U.S. 319 (1976); *Schultz v. Alabama*, 42 F.4th 1298 (11th Cir. 2022).

184.   Defendants' *De Facto* Policy by design includes no mechanism allowing Mr. and Mrs. Perez to receive notice of, let alone consent to, the District's decisions to meet secretly with A.P., to treat A.P as a boy using a false male name, and take other actions to promote a false male identity for A.P., all of which interfere with Mr. and Mrs. Perez's fundamental constitutional rights. The 2022 Policy regarding parental notification still fails to provide for notice to parents if their child refuses to discuss gender identity or similar issues with their parents, demonstrating that Defendants have failed to consider the significance of Plaintiffs' fundamental constitutional rights.

185.   Defendants' actions have deprived Mr. and Mrs. Perez of their fundamental constitutional rights to 1) direct the upbringing, including making mental health decisions, for their daughter, 2) maintain familial privacy without interference from the state, and 3) freely exercise their sincerely held religious beliefs without providing any notice, let alone the particularized process required under the Fourteenth Amendment.

186.   Alternative actions by Defendants, *e.g.,*1) enacting a parental notification policy that does not have an exception for minor children who refuse to speak to their parents and 2) supervising and training District staff that confidentiality laws as well as the Constitution and Florida parental rights laws require that parents be notified of issues related to their children's health and well-being regardless of the child's wishes, would diminish if not eliminate the deprivation of Plaintiffs' procedural due process rights.

187.   Defendants have not offered a legally sufficient reason for failing to provide such measures or alternatives that would ensure the protection of the Plaintiffs' procedural due process rights.

**Prayer for Relief:**

WHEREFORE, Plaintiffs request the following relief:

A.   A declaration that Defendants have violated Plaintiffs' right to procedural due process under the United States Constitution as set forth in Paragraphs 184-187.

B.   For nominal damages.

C.   For compensatory damages according to proof for the injuries caused by Defendants' acts and omissions, including a) emotional distress, b) ongoing emotional and psychological damage to A.P. requiring therapeutic interventions to rebuild the trust between her and her parents which was damaged by the actions of Defendants, c) ongoing emotional and psychological damage to the family dynamic, requiring therapeutic interventions to rebuild trust between parents and child which was damaged by the actions of Defendants, d) ongoing damage for loss of educational opportunities, and other injuries as proven at trial.

D.   For attorneys' fees and costs under 42 U.S.C. § 1988.

E.   For such other relief as the Court deems proper.

## SEVENTH CAUSE OF ACTION
### (Violation of the Parents' Bill of Rights, Florida Statutes, Chapter 1014)
### (By Mr. and Mrs. Perez individually Against Defendant School Board)

188.   Plaintiffs incorporate the factual allegations of paragraphs 16-104 by reference as if set forth in full.

189.   Effective July 1, 2021, The Parents' Bill of Rights reserves all parental rights, including the rights to direct the education, upbringing, moral and religious

training and to make health care decisions for their minor children to parents "without obstruction or interference from the state, any of its political subdivisions, any other governmental entity, or any other institution." Florida Statutes § 1014.04.

190.   Clay County School Board is a political subdivision of the state subject to the provisions of the Parents' Bill of Rights.

191.   Defendant has obstructed and interfered with Plaintiffs' fundamental parental rights and infringed on the fundamental rights of Plaintiffs to direct the education, upbringing, and moral or religious training and to make health care decisions for their minor child by 1) addressing mental health issues with A.P. without the knowledge or consent of Mr. and Mrs. Perez, and 2) withholding information regarding A.P.'s conflicts about her sex, the resulting increase in bullying she was subjected to, and the deterioration of her mental health to the point of becoming suicidal.

192.   Defendant School Board failed to comply with the requirements of the Parents' Bill of Rights by failing to enact policies and procedures for parental notice and for notifying students of crisis and suicide prevention resources, which resulted in harm to Plaintiffs.

193.   Defendant acted with knowledge of the requirements of the Parents' Bill of Rights when they withheld information from Mr. and Mrs. Perez that is required to be provided under the law, obstructed Mr. and Mrs. Perez's exercise of

the right to direct the education and upbringing of their daughter, interfered with medical and mental health decision making and obstructed the free exercise of the family's religion.

194.   Defendants cannot assert a compelling interest for violating Florida law, disregarding Plaintiffs' fundamental right to direct the upbringing, care, and education of their child. Defendant's prohibitions against parental notification are not narrowly tailored.

195.   Defendant's violation of the Parents' Bill of Rights has caused harm to Plaintiffs.

WHEREFORE, Plaintiffs request the following relief:

A.   A declaration that Defendant has violated Plaintiffs' fundamental rights as parents, under the Florida Parents' Bill of Rights as set forth in Paragraphs 191-194.

B.   For nominal damages.

C.   For compensatory damages according to proof for the injuries caused by Defendants' acts and omissions, including a) emotional distress, b) ongoing emotional and psychological damage to A.P. requiring therapeutic interventions to rebuild the trust between her and her parents which was damaged by the actions of Defendants, c) ongoing emotional and psychological damage to the family dynamic, requiring therapeutic interventions to rebuild trust between parents and child which

was damaged by the actions of Defendants, d) ongoing damage for loss of educational opportunities, and other injuries as proven at trial.

      D.    For such other relief as the Court deems proper.

Dated: May 31, 2023.

                              */s/Mary E. McAlister*
                              Mary E. McAlister (FL Bar No. 0010168)
                              CHILD & PARENTAL RIGHTS CAMPAIGN, INC.
                              P.O. Box 637
                              Monroe, VA 24574
                              770.448.4525
                              mmcalister@childparentrights.org

                              Vernadette R. Broyles (GA Bar No. 593026)*
                              Ernest G. Trakas (MO Bar 33813)*
                              CHILD & PARENTAL RIGHTS CAMPAIGN, INC.
                              5805 State Bridge Rd., Suite G310
                              Johns Creek, GA 30097
                              770.448.4525
                              vbroyles@childparentrights.org
                              etrakas@childparentrights.org
                              *admitted pro hac vice

                              Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I certify that on this 31st day of May, 2023, a true and correct copy of the foregoing was electronically filed in the U.S. District Court, Middle District of Florida, using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

/s/ *Mary E. McAlister*
MARY E. MCALISTER