**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**(JACKSONVILLE DIVISION)**

| | | |
|---|---|---|
| Wendell Perez, *et. al* | ) | Case No: 3:22-cv-0083-TJC-JBT |
| Plaintiffs, | ) | |
| v. | ) | **Plaintiff's Supplemental Brief** |
| | ) | **In Opposition To Defendants'** |
| Clay County School Board, *et al.* | ) | **Motion To Dismiss The Second** |
| | ) | **Amended Complaint** |
| Defendants. | ) | |

Plaintiffs, by and through counsel, submit the following supplemental brief in opposition to Defendants' Motion to Dismiss the Second Amended Complaint [Dkt 46]:

### I. INTRODUCTION

Since the Eleventh Circuit has issued the mandate in *Littlejohn v. Leon County School Board,* 132 F.4th 1232 (11th Cir. 2025), Defendants' motion to dismiss Plaintiffs' Second Amended Complaint is again pending before this Court. *Littlejohn* is one of three significant, relevant appellate court decisions issued since this Court's order deferring ruling on the Motion to Dismiss on March 15, 2024. [Dkt. 52]. *See also, Foote v. Ludlow School Committee*, 128 F.4th 336 (1st Cir. 2025), *Mahmoud v. Taylor*, 145 S.Ct. 2332 (2025). The parties requested, and this Court granted the request to submit supplemental briefing to provide the Court with additional arguments related to the intervening precedents.

*Mahmoud* explicitly addresses the Pérezes' First Amendment free exercise claim in a way that further demonstrates that Plaintiffs' allegations exceed the standards for stating a viable claim under Rule 12b6. The *Mahmoud* Court did not

1

explicitly address a substantive due process parental rights claim. However, its analysis of parents' free exercise rights in the public school context traced the 100-year history of recognition of fundamental parental rights that is persuasive for this Court's review of the Pérezes' substantive due process claims, and powerfully undermines the individual Defendants' claims that they are subject to qualified immunity.

Finally, in *Foote,* the First Circuit determined that the school district's secret transitioning of the petitioners' daughter pursuant to a policy similar to the De Facto Policy at issue here was legislative action, not "executive" action subject to the "shocks the conscience" test. This cautions against simply applying the *Littlejohn* panel decision as binding precedent without considering the factual and legal differences between this case and *Littlejohn.*[1]

A detailed analysis of the allegations of the Second Amended Complaint, accepted as true, utilizing the framework described in *Mahmoud* establishes that the Pérezes have exceeded the pleading standards of *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) for their free religious exercise and parental rights claims under the First and Fourteenth amendments. That analysis also disposes of the individual Defendants' claims that they are absolved of liability for their actions because the rights were not "clearly established."

---

[1] That circuit split is the subject of a Petition for Certiorari the Littlejohns have filed with the Supreme Court of the United States, *Littlejohn v. Leon County Schools,* SCOTUS Case No. 25-259. *Foote v. Ludlow School Committee is* also under consideration by the Supreme Court of the United States, Case No. 25-77, but the split with *Littlejohn* regarding "shocks the conscience" is not part of that petition.

These intervening significant and relevant precedents establish the viability of Plaintiffs' claims. Therefore, Defendants' Motion to Dismiss the Second Amended Complaint should be denied and Plaintiffs permitted to proceed with discovery.

## ARGUMENT

I. *Mahmoud*'s delineation of parents' First Amendment rights to direct their children's religious upbringing in the public school setting establishes the viability of Plaintiffs' free exercise claims.

Building on decades of precedent, *Mahmoud* affirmed that parents' rights to direct the upbringing of their children are fundamental constitutional rights that include the right to direct the religious upbringing of their children in the public school setting. 145 S.Ct. at 2350-2351. As the *Mahmoud* court affirmed, the Supreme Court has long recognized the fundamental right of parents to direct the upbringing of their children. See *Troxel v. Granville*, 530 U.S. 57, 65–68 (2000) ("perhaps the oldest of the fundamental liberty interests"); *See also Parham v. J.R.*, 442 U.S. 584, 602 (1979) (there is a presumption that fit parents act in their children's best interests). In *Mahmoud*, the Supreme Court affirmed that the long recognized fundamental right of parents to direct the upbringing of their children includes the right to direct religious upbringing. 145 S. Ct. at 2350 *(citing Espinoza v. Montana Dept. of Revenue*, 591 U.S. 464, 486 (2020) (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 213–214 (1972))).

In *Mahmoud,* as here, the school board policies prohibited parental notification related to staff-student interactions, and in *Mahmoud,* materials that conflicted with parents' sincerely held religious beliefs. *Id.* at 2341-2342. Those policies posed "a very real threat of undermining the religious beliefs and practices

3

that the parents wish to instill in their children." *Id.* at 2361. "And a government cannot condition the benefit of free public education on parents' acceptance of such instruction." *Id.* As Defendants do here, school officials in *Mahmoud* attempted to justify the policies as legitimate pedagogical functions, necessary to encourage a "safe and inclusive" learning environment and required to "prevent stigma." The *Mahmoud* Court rejected those asserted justifications, stating that they do not constitute compelling interests to override parents' free exercise rights. *Id.* at 2363. This Court should do the same.

The *Mahmoud* Court examined several factors that cumulatively supported the conclusion that the parent plaintiffs had successfully shown a likelihood of success on the merits of their claim that the district violated the parents' free exercise rights.   The Pérezes' allegations meet or exceed the considerations addressed in *Mahmoud*.

**Age and grade level of the child.**

The *Mahmoud* Court emphasized how the public school setting is itself coercive, particularly for elementary-age students. 145 S. Ct. at 2355. "'The State exerts great authority and coercive power through' public schools 'because of the students' emulation of teachers as role models and the children's susceptibility to peer pressure.'" *Id.* (citing *Edwards v. Aguillard*, 482 U.S. 578, 584 (1987)). "Young children, like those of petitioners, are often 'impressionable' and 'implicitly trust' their teachers." *Id.*

Here, A.P. was a 12-year-old sixth grader at Paterson Elementary School. (Second Amended Complaint, "SAC" ¶17). She was greatly affected by peer pressure, particularly bullying that went unaddressed by the school. (SAC ¶¶18-20). That bullying made her particularly susceptible to influencers promoting the idea that she could be "like a boy" (i.e., "transgender") and thus would not be bullied (SAC ¶¶20-21, 27). Her family's sincerely held religious beliefs taught her that she needed to respect authority figures such as teachers and counselors, so she saw them as role models whose ideas should be respected and who implicitly could be trusted. (SAC ¶32). A.P, a 12-year-old victim of bullying, was particularly impressionable, so that when she saw the LGBTQ-friendly posters and materials in Mrs. Washington's office and heard Mrs. Washington's positive comments regarding "transgenders," it had a considerable effect on her, as did the LGBTQ-friendly books and instruction at issue in *Mahmoud.*

**Parents' sincerely held religious beliefs.**

The *Mahmoud* Court emphasized the stringent protection accorded to sincerely held religious beliefs, even in the public school context. "[T]he right to free exercise, like other First Amendment rights, is not 'shed ... at the schoolhouse gate.'" 145 S.Ct. at 2350 (citing *Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503, 506–507 (1969)). The right to free exercise of religion "is not merely a right to teach religion in the confines of one's own home. Rather, it extends to the choices that parents wish to make for their children outside the home," including the choice to send their children to private or public school. *Id.* at 2351 (citing *Pierce v.*

*Society of Sisters*, 268 U.S. 510, 532–535 (1925)). "The right of parents 'to direct the religious upbringing of their' children would be an empty promise if it did not follow those children into the public school classroom. We have thus recognized limits on the government's ability to interfere with a student's religious upbringing in a public school setting." *Id.* "Government schools, like all government institutions, may not place unconstitutional burdens on religious exercise." *Id.* at 2350. In *Mahmoud,* the parent plaintiffs had alleged that their sincerely held religious beliefs included that "biological sex reflects divine creation, that sex and gender are inseparable, and that children should be encouraged to accept their sex and to live accordingly," and that the district's policies undermined those beliefs. *Id.* at 2354.

Likewise, here the Pérezes have alleged that their family is Roman Catholic and they "live their lives in accordance with sincerely held religious beliefs. Their sincerely held beliefs are based on Scripture, Church teachings, natural law, and objective truth, including that human beings are created male and female, which cannot be changed, and that children are to respect their parents and other adult authority figures." (SAC, ¶¶11, 6, 34, 47, 92).

**Compelled exposure to instruction or activities that conflict with religious beliefs.**
In *Mahmoud,* the Court found that the parents' free exercise rights were violated by district policies that compelled their children to be exposed to instruction and materials that undermined the parents' religious beliefs. 145 S.Ct. at 2353. For example, instruction that same-sex "marriage" should be accepted and celebrated and that "at any point in our lives, we can choose to identify with one gender, multiple

6

genders, or neither gender," conflicted with the parents' religious beliefs that biological sex is part of the divinely created order. 145 S.Ct. at 2354. Such instruction, the Court said, "imposes the kind of burden on religious exercise that *Yoder* found unacceptable," 145 S.Ct. at 2353 (citing *Wisconsin v. Yoder*, 406 U.S. 205, 211, 218 (1972)).

The Pérezes allege that A.P. was required to participate in counseling and school-facilitated activities that conflicted with her family's religious beliefs, including being encouraged to adopt a male identity and keep secrets from her parents (SAC, ¶28–34, ¶118). A.P. was disturbed by the conversations with Mrs. Washington who expressed disapproval of church teachings regarding modesty and telegraphed to A.P. that it was acceptable to question church teachings and her parents' instruction in accordance with those teachings. (SAC, ¶38). The Pérezes allege that the school's conduct prevented them from directing A.P.'s upbringing pursuant to their faith by denying them the information needed to counsel A.P. and respond to bullying in a manner consistent with their religious beliefs (SAC, ¶162, ¶174).

**Denial of advance notice and opportunity to opt out.**

In *Mahmoud,* the district's prohibitions on parental notice and opt outs from the objectionable instruction were critical factors in the Court's finding that the school board had substantially interfered with "the religious development of their children." 145 S.Ct. at 2353. The Board's introduction of the "LGBTQ+-inclusive" storybooks—combined with its decision to withhold notice to parents and to forbid

7

opt outs—substantially interferes with the religious development of their children and imposes the kind of burden on religious exercise that Yoder found unacceptable." *Id.* In particular, the Court found that the district's proposed curriculum placed "an unconstitutional burden on the parents' religious exercise if it is imposed with no opportunity for opt outs." *Mahmoud*, 145 S. Ct. at 2363.

The district's actions here pose the same constitutional infirmity. The Pérezes were not notified about the counseling sessions, the gender identity discussions with Mrs. Washington, the bullying, Mrs. Washington's use of a male name and pronouns for A.P. at school, the sharing of the male name and pronouns with classmates without A.P.'s consent, or the escalated bullying resulting from her nonconsensual sharing of the male name and pronouns. (SAC, ¶¶23, 26, 34, 44, 91, 97–98, 118). The district's De Facto Policy and later Policy 1.15 explicitly stated that parents would not be notified unless the child consented, which pre-emptively denied parents any opt-out opportunity (SAC, ¶¶76–78, 98–100).

**Adverse consequences, including stigma, isolation, and harm.**

In *Mahmoud*, the Court rejected the district's claim that providing for opt outs was justified to protect LGBTQ students from stigma, isolation, and other asserted harms, saying "the Board cannot purport to rescue one group of students from stigma and isolation by stigmatizing and isolating another." 145 S.Ct. at 2363. The parents' allegations of stigma, isolation, and harm suffered by them and their children showed that this was precisely what the Board had done. *Id.* While "[a] classroom environment that is welcoming to all students is something to be commended, it

8

cannot be "achieved through hostility toward the religious beliefs of students and their parents." *Id.*

Likewise, here the allegations of the Second Amended Complaint show that the district subjected A.P. and her parents to stigma and harm in the name of a purported "welcoming" environment. The Pérezes allege that A.P. became increasingly distressed about being coerced into living a secret double life, felt that Mrs. Washington had total control over her life at school, and believed she had no recourse but suicide to counter the distress caused by the secrecy and hostility toward her family's faith. (SAC, ¶¶39–40, 44–45, 54, 120, 139).

Consequently, the Pérezes' allegations are not only sufficient to meet the pleading standards of *Twombly* and *Iqbal,* but they track the precise elements the Supreme Court found determinative in *Mahmoud.* The Perez parents were denied procedural safeguards and excluded from decision-making, and their religious beliefs were treated as problematic by school staff. The counselor's public use of a new name in front of peers, without the child's request or consent, directly exacerbated the bullying and isolation the child endured. (SAC, ¶31–32, ¶39–40, ¶43–45). Moreover, the school's failure to follow its own anti-bullying policy and the deliberate exclusion of the parents, admittedly motivated by hostility to their Catholic faith, demonstrate a causal link between the district's conduct and the child's escalating mental health crisis (SAC, ¶¶19, 23, 34, 39–40, 44–45, 54, 58, 61–62, 63, 69, 76–78, 83–85, 85–88, 91, 97–100). The burden on free exercise, and the harm thereby caused, is clear and substantial.

9

As was true in *Mahmoud*, the Pérezes' free exercise rights cannot be sacrificed to satisfy the district's purported desire to be "welcoming" to "transgender" students. *Mahmoud* forecloses dismissal of the free exercise claims and requires that the case proceed to discovery.

**II.    The Eleventh Circuit's decision in *Littlejohn* does not require dismissal of Plaintiffs' substantive due process parental rights claims.**

 **A.  *Factual and legal differences between Littlejohn and this case mean Littlejohn should not be considered a binding precedent.***

*Littlejohn* offers persuasive guidance for analyzing parental rights claims in the school setting, but factual and legal differences between *Littlejohn* and this case militate against treating *Littlejohn* as dispositive. In *Littlejohn*, the Eleventh Circuit panel held that the challenged conduct of school officials creating a support plan for a student's "gender identity" and permitting social transition at school without parental knowledge constituted "executive action." *Littlejohn,* 132 F.4th at 1242. As a result, the court applied the "shock the conscience" standard, which requires egregious conduct to establish a substantive due process violation. *Id.* at 1243. The court found no constitutional violation because it concluded that the officials' actions, while excluding the parents from certain decisions, did not rise to the level of egregiousness required because there was no physical harm, removal from custody, or malicious intent, and the parents were at least partially aware of their child's situation and able to engage with school staff. *Id.* at 1245.

*Littlejohn* is distinguishable in ways that militate against treating it as binding. The Eleventh Circuit characterized Leon County's actions as "executive" and subject to the "shocks the conscience test because of circumstances unique to that case. 132 F.4th at 1243 n. 8. The Eleventh Circuit said that "legislative" acts "generally apply to a larger segment of—if not all of—society; laws and broad-ranging executive regulations are the most common examples." *Id.* at 1242. "For example, a school board rule of general applicability is 'legislative' action." *Id. (citing Harrah Indep. Sch. Dist. v. Martin*, 440 U.S. 194, 198 (1979) (per curiam)). "To be sure, the [Transgender Support] Guide itself is arguably "legislative," as it was a 'broad-ranging' policy that 'generally appl[ied] to a larger segment of ... society,' the Leon County School District." *Id.* Nevertheless, the *Littlejohn* panel categorized Defendants' actions as "executive" because the Court claimed that the Littlejohns "waived" any challenge to the document and were challenging only application of the document to the Littlejohns' daughter, which the Eleventh Circuit labeled as "executive." *Id.* The Defendants and district court also claimed that a subsequent policy somehow mooted the Guide, which was the subject of the Littlejohns' challenge. *Id.* at 1243.

By contrast, here, there is no claimed "waiver" of the *De Facto* Policy, "sanctioned by the School Board and implemented by Mr. Broskie that directs District staff that parents are not to be told when their child asserts a discordant gender identity and are identified as something other than their sex at school, including with alternate names and pronouns, unless the child approves of the transmission of the

11

information to their parents." (SAC ¶74). There is also no allegation that the *De Facto* Policy was mooted by subsequent policies. To the contrary, the 2022 Policy adopted by the School Board "incorporate[d] the De facto Policy's provision that parents are not to be notified if their child does not approve." (SAC ¶100). Unlike in *Littlejohn*, there are no allegations of any actions or statements that could transform the legislative policies into executive acts aimed only at the Pérezes.

The consequences of the staff's actions for the parents and child are also different. In *Littlejohn,* the child notified the parents about the district's conduct, and the parents were able to respond before the child suffered significant physical harm. By contrast here, the secrecy and deceit continued until A.P. attempted suicide twice at school. (SAC ¶¶ 26-56). Therefore, even if Defendants' actions were labeled as "executive" and subject to "shocks the conscience," the analysis would yield a different conclusion. A.P. was subjected to persistent bullying that was not addressed by school staff and was exacerbated by Mrs. Washington's actions taken without A.P.'s consent. (SAC ¶¶ 26-56). Mrs. Washington still did not address the bullying but brushed it off as part of life. (SAC ¶ 45). A.P. was also disturbed by Mrs. Washington's conversations that implicitly expressed disapproval of church teachings regarding modesty and telegraphed to A.P. that it was acceptable to question church teachings and her parents' instruction in accordance with those teachings. (SAC ¶ 38). A.P. became increasingly distressed about being coerced into living a secret double life. A.P. felt that Mrs. Washington had total control over A.P.'s life at school and that A.P. had no recourse to enduring the distress caused by the secrecy and increasing

12

bullying that Mrs. Washington refused to address. This led her to attempt suicide twice at school. (SAC ¶¶ 48, 43-55).

Given these distinctions, *Littlejohn* should not be viewed as binding precedent for this Court's consideration of Defendants' motion. Instead, the Court should analyze the unique facts and legal posture of this case using *Littlejohn* as one, but not the sole measuring stick.

> **B.    The Littlejohn Court acknowledged and did not reject wholesale the First Circuit's classification of similar school district actions as legislative and not subject to "shocks the conscience."**

The First Circuit analyzed school district actions substantially similar to the actions taken by Defendants here as "legislative," rather than "executive" and therefore did not apply the "shock the conscience" test before proceeding to strict scrutiny analysis. *Foote,* 128 F.4th 336 (1st Cir. 2025). *Foote* provides an alternative framework for analyzing the *Perez* substantive due process claims, a framework in keeping with the distinctive facts of this case and not entirely rejected by the Eleventh Circuit in *Littlejohn*. The *Littlejohn* Court recognized that its categorization of the Defendants' actions vis-a-vis the Littlejohn's daughter differed from the categorization of similar actions taken by the Ludlow School Committee in *Foote*. *Littlejohn,*132 F.4th at 1243 n. 8. "We reach a different conclusion than the First Circuit recently did when it determined a similar school-gender-identity policy was legislative action." *Id.* (citing *Foote,* 128 F.4th at 346–47).

> [I]n *Foote*, the Protocol was itself the "chief target of the Parents' complaint." The focus of the parents' challenge in *Foote* was a more characteristically legislative act—a general policy and its routine applications—not, as we see it here, a more characteristically executive act—the specific application of a general policy to one person.

*Id.*

> To be sure, we've explained that similar regulations or policies may be legislative acts themselves, *see Crymes [v. DeKalb County*, 923 F.2d [1482] 1485–86 [11th Cir. 1991], and plaintiffs could surely style their complaints to challenge them as legislative action. But the Littlejohns didn't do that here; they challenged the 'application of existing policies' to their child. And that, we've held, is the hallmark of executive action.

*Id.*

Here, by contrast, the Pérezes have styled their Complaint to challenge Defendants' conduct as legislative. There are no issues of waiver or mootness as the Eleventh Circuit said there were in *Littlejohn*. Consequently, there is no justification for re-labeling what the Eleventh Circuit said would be a "legislative" act but for the waiver and mootness issues. This Court should not apply the "shocks the conscience" test but proceed to strict scrutiny in reviewing the Pérezes' substantive due process claims. Even if the District's actions were categorized as executive and subject to "shocks the conscience" analysis, the significant factual differences between *Littlejohn* and this case, particularly the nature of Defendants' actions and extent of harm to the Pérezes (*i.e.*, leading to their child's suicide attempts at school) militate in favor finding that Defendants' actions "shocked the conscience." The district's motion to dismiss the substantive due process parental rights claims should be denied.

14

**III.** ***Mahmoud* establishes that the individual defendants are not entitled to qualified immunity on either the substantive due process or free exercise parental rights claims.**

*Mahmoud* memorialized and clarified fundamental parental rights in the school context that have been recognized by the Supreme Court for 100 years. 145 S.Ct. at 2351 (citing *Pierce v. Society of Sisters*, 268 U.S. 510, 532–535 (1925)). "We have thus recognized limits on the government's ability to interfere with a student's religious upbringing in a public school setting." *Id.* at 2351-52 (citing *West Virginia Bd. of Ed. v. Barnette,* 319 U.S. 624, 630-31 (1943) (involving compelled conduct); *Yoder,* 406 U.S. at 211, 218 (involving subtle pressure to conform to contrary views).

In *Yoder,* decided more than 50 years ago, the Supreme Court said, "the values of parental direction of the religious upbringing and education of their children in their early and formative years have a high place in our society." 406 U.S. at 213-14. "[A] State's interest in universal education, however highly we rank it, is not totally free from a balancing process when it impinges on fundamental rights and interests, such as those specifically protected by the Free Exercise Clause of the First Amendment, and the traditional interest of parents with respect to the religious upbringing of their children so long as they, in the words of *Pierce*, 'prepare (them) for additional obligations.'" *Id.* (citing *Pierce, 268* U.S. at 535). The *Mahmoud* Court built upon the 50-year-old foundation of *Yoder*, which built upon the 100-year-old foundation of *Pierce.*

Therefore, contrary to Defendants' arguments, the rights asserted by the Perez family are not "something pretty close to" a right of first impression, or "an unsettled area of constitutional law, such that a reasonable person would not be able to know

15

when their conduct is in violation of the law." (Memorandum in Support of MTD SAC, Dkt. 46, at 18). The century-old pedigree of the right of parents to direct the religious upbringing of their children affirmed in *Mahmoud* is a textbook example of a clearly established fundamental right. The individual defendants cannot feign ignorance of what has been established for 100 years. Therefore, they cannot claim qualified immunity.

## CONCLUSION

The Supreme Court's decision in *Mahmoud* is controlling on the free exercise claims: school policies denying parents notice and opt-out rights for instruction or counseling that conflicts with parents' sincerely held religious beliefs impose a substantial burden on free exercise and cannot be justified by administrative convenience or generalized interests in "inclusivity." The Second Amended Complaint tracks the *Mahmoud* framework, pleading specific facts regarding age, religious beliefs, compelled exposure, denial of notice, lack of opt-out, hostility toward religion, and adverse consequences, all of which the Supreme Court found determinative.

The facts alleged in the Second Amended Complaint are distinguishable from the facts *in Littlejohn* that the Eleventh Circuit found to require categorizing the otherwise legislative act as executive. Therefore, the Pérezes' claims should not be subject to a "shocks the conscience" analysis, but to strict scrutiny. Under that exacting standard, the allegations state a claim for violation of the Perezes' substantive due process rights.

Finally, *Mahmoud's* affirmation of the decades-long pedigree of the constitutional rights asserted by the Perezes disposes of any claim of qualified immunity on the part of the individual Defendants.

For these reasons and the reasons stated in Plaintiffs' original Brief in Response, Defendants' Motion to Dismiss the Second Amended Complaint should be denied.

Dated: September 30, 2025.

*/s/Mary E. McAlister*
Mary E. McAlister (FL Bar No. 0010168)
CHILD & PARENTAL RIGHTS CAMPAIGN, INC.
P.O. Box 637
Monroe, VA 24574
770.448.4525
mmcalister@childparentrights.org

Vernadette R. Broyles (GA Bar No. 593026)*
Ernest G. Trakas (MO Bar 33813)*
CHILD & PARENTAL RIGHTS CAMPAIGN, INC.
5425 Peachtree Pkwy Suite 110
Norcross, GA 30092
770.448.4525
vbroyles@childparentrights.org
etrakas@childparentrights.org
Attorneys for Plaintiffs
*Admitted pro hac vice

17

**CERTIFICATE OF SERVICE**

I certify that on this 30th day of September, 2025, a true and correct copy of the foregoing was electronically filed in the U.S. District Court, Middle District of Florida, using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

/s/ *Mary E. McAlister*
MARY E. MCALISTER